No. 23-35408

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

ELDON GALE SAMUEL, III,
Petitioner-Appellant,

v.

TEREMA CARLIN,
Respondent-Appellee.

_____

On appeal from the United States District Court
For the District of Idaho
Case No. 2:20-cv-00545-REP
Hon. Raymond Edward Patricco, Jr., Presiding

_____

**EXCERPTS OF RECORD, VOLUME 1 of 12**

_____

Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho, 83702
P: (208) 724-2617
chd@fergusondurham.com
*Counsel for Appellant*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ELDON GALE SAMUEL, III,<br><br>     Petitioner,<br><br>  v.<br><br>TEREMA CARLIN,<br><br>     Respondent. | Case No. 2:20-cv-00545-REP<br><br>**JUDGMENT** |

In accordance with the Memorandum Decision and Order filed on this date, IT IS
ORDERED, ADJUDGED, and DECREED that the Petition for Writ of Habeas Corpus is
DENIED, and judgment is entered in favor of Respondent. In addition, this case is hereby
ordered closed.

DATED:  May 24, 2023

Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| ELDON GALE SAMUEL, III,<br><br>                    Petitioner,<br><br>      v.<br><br>TEREMA CARLIN,<br><br>                    Respondent. | Case No. 2:20-cv-00545-REP<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is a Petition for Writ of Habeas Corpus filed by Idaho prisoner Eldon Gale Samuel, III, challenging Samuel's Kootenai County convictions on one count of second-degree murder and one count of first-degree murder, stemming from the deaths of Samuel's father and brother, respectively. *See* Dkt. 1. The Petition is now fully briefed and ripe for adjudication.

All parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. *See* Dkt. 5.

The Court takes judicial notice of the records from Samuel's state court proceedings. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 n.1 (9th Cir. 2006). Having carefully reviewed the record in this matter, including the state court record, the Court concludes that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d).

Accordingly, and for the reasons explained below, the Court enters the following Order denying habeas corpus relief.

## BACKGROUND

The following facts of Samuel's case, as described by the Idaho Supreme Court, are presumed correct absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1).

Samuel was born in 1999 in California. His brother was eleven months younger than Samuel. Samuel's brother "was severely autistic and required significant attention." *State v. Samuel*, 452 P.3d 768, 775 (Idaho 2019). Samuel's parents were both addicted to prescription painkillers, leading to financial problems, arrests, and criminal charges.

Samuel and his family "lived in shoddy, cockroach-infested residences and moved frequently, usually after they had been evicted for not paying rent. Samuel's mother … became suicidal[] and was hospitalized several times." *Id*. Samuel's father "began to believe that a 'zombie apocalypse' was inevitable" and taught Samuel "how to kill zombies by playing violent video games, watching zombie themed movies, and training Samuel to use knives and guns." *Id*.

Samuel witnessed extreme violence throughout his childhood. When he was four, "he watched his father pour lighter fluid on his mother and threaten to burn her alive." *Id*. When Samuel was six, "he watched his father intentionally drive over his mother, breaking her collar bone." *Id*. When Samuel was ten, his father "pointed a gun at his mother's head, bound her with duct tape, and forced Samuel to urinate on her." *Id*.

"By 2013, Samuel's mother had left and Samuel's father moved to Idaho with Samuel and his brother." Samuel had health problems and "had frequent visits to the doctor for insomnia, nausea, migraines, blurred vision, and congestion." *Id.*

In March 2014, when Samuel was fourteen years old, "officers responded to a 911 call at Samuel's residence. Samuel told the operator that his brother and dad had been shot." *Id.*

Samuel initially told officers that his father had killed his brother. However, Samuel eventually waived his *Miranda* rights and confessed to both murders.

According to Samuel's confession, his father, who was on medication at the time, "shot a .45 gun outside, believing that a 'zombie apocalypse' had begun." *Id.* Samuel's father pushed Samuel in the chest, and Samuel picked up his father's gun. When Samuel's father pushed him again, Samuel shot him in the stomach.

After he was shot, Samuel's father crawled into Samuel's brother's room. Samuel pursued, believing that the first shot did not kill his father. Samuel shot his father "three more times in the head once he reached Samuel's brother's room." *Id.* at 775–76.

After killing his father, Samuel saw his younger brother hiding under the bed. His brother did not obey Samuel's instruction to come out. Samuel retrieved a shotgun and shot his brother while he was still under the bed.

Samuel "reloaded the shotgun and continued to shoot his brother." *Id.* at 776. Samuel then dropped the shotgun and started stabbing his brother with a knife. He also swung a machete at his brother through the bed frame. "When his brother tried to climb out from underneath the bed, Samuel hit him in the back of the head with the machete."

*Id.* Samuel "continued to swing the machete as hard as he could until his brother stopped talking and was quiet." *Id.*

Samuel was initially charged with two counts of first-degree murder, but the magistrate judge did not find probable cause for the premeditation element for Samuel's father's murder. As a result, Samuel was bound over on second-degree murder for the death of his father, and first-degree murder for the death of his brother. *Id.*

Samuel moved to suppress his confession, arguing (1) that the waiver of his *Miranda* rights was not knowing, intelligent, and voluntary and (2) that the confession was coerced. *Id.* The trial court denied the motion.

The defense theory at trial "was that Samuel killed his father in self-defense, and that he killed his brother in a rage—committing manslaughter[,] not murder." *Id.* The jury found Samuel guilty of the second-degree murder of his father and the first-degree murder of his brother.

Samuel appealed. As relevant to this habeas case, the Idaho Supreme Court affirmed the trial court's denial of Samuel's motion to suppress his confession, holding that Samuel's *Miranda* waiver was valid and that his confession was voluntary. *Id.* at 781–88.

In his federal Petition, Samuel asserts two claims. First, Samuel argues that his *Miranda* waiver was not knowing, intelligent, and voluntary. Second, he argues that his confession was not voluntary but, rather, was the result of coercion by the police.

# HABEAS CORPUS STANDARD OF LAW

A federal court may grant habeas corpus relief when it determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). If the state court has adjudicated a claim on the merits, habeas relief is further limited by § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, federal habeas relief must be denied unless the state court's adjudication of the petitioner's claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The term "unreasonable" in § 2254(d) is reserved for "extreme malfunctions in the state criminal justice system," not for "ordinary error" or even for cases "where the petitioner offers a strong case for relief." *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021) (per curiam) (internal quotation marks omitted). Accordingly, a federal court reviewing a state court's adjudication of a claim on the merits "must carefully consider all the reasons and evidence supporting the state court's decision." *Id*. Courts are not permitted "to essentially evaluate the merits *de novo* by omitting inconvenient details from its analysis." *Id*. (internal quotation marks and alteration omitted). Instead, "[d]eciding whether a state court's decision involved an unreasonable application of federal law or was based on an unreasonable determination of fact requires the federal habeas court to

train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims and to give appropriate deference to that decision." *Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018) (internal quotation marks and citations omitted).

When a petitioner contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1), the petitioner must show that the state court—although identifying "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S. 415, 426 (2014) (emphasis omitted).

The AEDPA standard is extraordinarily high, and a federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong. Rather, the state court's application of federal law

must be objectively unreasonable to warrant relief. *Williams*, 529 U.S. at 411. If there is *any* possibility that fair-minded jurists could disagree on the correctness of the state court's decision, § 2254(d)(1) precludes relief. *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013); *Harrington v. Richter*, 562 U.S. 86, 101–02 (2011). In other words, if one fair-minded jurist could agree that the state court's decision is reasonable, habeas relief must be denied—even other fair-minded jurists would disagree.

"Clearly established federal law" means the governing legal principles set forth in the holdings—not the dicta—of the United States Supreme Court, as of the time the state court rendered its decision. *Williams*, 529 U.S. at 412. The habeas statute does not require an *identical* factual pattern before a legal rule must be applied. Rather, state courts must reasonably apply the rules squarely established by the Supreme Court's holdings to the facts of each case. *See White*, 572 U.S. at 427.

On the other hand, if a court must *extend* a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state court's decision. *Id.* at 407. A federal habeas court "may not overrule a state court for … holding a view different from its own" when the precedent from the Supreme Court "is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003). Although circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent, *Duhaime v. Ducharme*, 200 F.3d 597, 600–01 (9th Cir. 2000), a federal court may not use circuit law to refine or sharpen a general principle of Supreme Court habeas corpus jurisprudence into a specific

legal rule that the Supreme Court itself has not announced, *Lopez v. Smith*, 574 U.S. 1, 7 (2014).

If no Supreme Court decision has confronted the specific question presented by a state prisoner's federal habeas petition—that is, if the circumstances of a petitioner's case are only generally similar to the Supreme Court's precedents—then the state court's decision cannot be "contrary to" any holding from the Supreme Court. *Woods v. Donald*, 575 U.S. 312, 317 (2015) (per curiam). By the same token, a state court cannot unreasonably apply established federal law that does not exist. *See, e.g., Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). Therefore, if (1) a claim was adjudicated on the merits in state court, and (2) the underlying factual determinations of the state court were not unreasonable, then evidence that was not presented to the state court cannot be introduced on federal habeas review. *See Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014) ("After *Pinholster*, a federal habeas court may consider new evidence only on de novo review, subject to the limitations of § 2254(e)(2).").

To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable ... in light of the evidence presented in the State court proceeding." A "state-court factual determination is not unreasonable merely because the federal habeas court would have

reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."). Instead, state court factual findings are presumed to be correct and are binding on the federal court unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Kirkpatrick v. Chappell*, 926 F.3d 1157, 1170 (9th Cir. 2019) (holding that § 2254(e)(1) "appears to apply to all factual determinations made by state courts"). "If reasonable minds reviewing the record might disagree about the finding in question," the finding is not unreasonable under § 2254(d)(2). *Pizzuto v. Yordy*, 947 F.3d 510, 530 (9th Cir. 2019) (internal quotation marks and alterations omitted).

If a petitioner satisfies § 2254(d)—either by showing that the state court's adjudication of the claim was contrary to or an unreasonable application of Supreme Court precedent under subsection (d)(1), or by establishing the state court's decision was based on an unreasonable factual finding under subsection (d)(2)—then the federal habeas court must review the petitioner's claim de novo, meaning without deference to the state court's decision. *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014). When considering a habeas claim de novo, a district court may, as in the pre-AEDPA era, draw from both United States Supreme Court and circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989), *as modified by Edwards v. Vannoy*, 141 S. Ct. 1547, 1560 (2021).

Even under de novo review, however, if the factual findings of the state court are not unreasonable under § 2254(d)(2), the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle v. Morgan*, 313 F.3d 1160, 1167–68 (9th Cir. 2002); *Kirkpatrick*, 926 F.3d at 1170 ("Unlike § 2254(d), § 2254(e)(1)'s application is not limited to claims adjudicated on the merits [by a state court]."). Conversely, if a state court factual determination is unreasonable, the federal court is not limited by § 2254(e)(1) and may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *See Murray*, 745 F.3d at 1000.

Even if a petitioner succeeds in demonstrating a constitutional error in his conviction, he is entitled to federal habeas relief only if the petitioner "can establish that [the error] resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Under the *Brecht* standard, an error is not harmless, and habeas relief must be granted, only if the federal court has "grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted). A "reasonable possibility" of prejudice is insufficient. *Brecht*, 507 U.S. at 637.

## DISCUSSION

### 1.  Factual Basis for Samuel's Claims

The Idaho Supreme Court accurately described the circumstances of Samuel's arrest and videotaped interrogation. Responding to Samuel's 911 call, police "arrived at Samuel's home, patted him down, and placed him in handcuffs." *Samuel*, 452 P.3d at

782. During this time, police officers did not ask Samuel "any questions that would elicit incriminating statements." *Id*.

Approximately forty minutes after the 911 call, officers took Samuel to the police station and placed him in an interview room. "One officer stayed in the room with Samuel, and a few minutes later at least two other officers entered the room." The officers took Samuel's bloody clothing, took photographs, and obtained swabs from Samuel. "During this process Samuel was asked if he needed anything and Samuel said that he would just like water." *Id*. Samuel was given new clothing, but was not provided with underwear, socks, or shoes. "[T]he officers repeatedly spoke with Samuel to ensure he was doing all right." *Id*. This pre-interview process took around 35 to 40 minutes.

Two officers stayed in the interview room: Sergeant McCormick and Detective Wilhelm. Detective Wilhelm, "who took the lead in Samuel's interrogation," was the resource officer at Samuel's school. *Id*. He asked Samuel preliminary questions, such as his "age and contact information, if he was in any physical discomfort, when he last ate, and how well he slept the previous night. Notably, Samuel did not know his phone number or address." *Id*. With respect to his physical comfort, Samuel "suggested that he always hurts all over." *Id*. Samuel told the officers "he had two hot dogs with the bun, and two raw hot dogs around 12:00." *Id*. Samuel also said that "he got 'good enough' sleep because he takes medication." *Id*.

Detective Wilhelm then gave Samuel a copy of the *Miranda* waiver form. Wilhelm's explanation lasted around four minutes and takes up about four pages of the transcript:

Detective Wilhelm: Alright. Well, if you're okay let's get down to why—why we're here to talk today. Is that okay with you?

Samuel: Yeah.

Detective Wilhelm: I'm gonna scoot forward a little bit so I can go over this with you, okay?

Samuel: Okay.

Detective Wilhelm: We didn't go over this in the office, but 99% of the kiddos in my office we give them this warning because sometimes we talk to the parents about what we're gonna talk about and sometimes we won't. Okay? So, I've actually got two of these, so I'm gonna give you that, and then I've got one and I'm gonna explain it to you, okay? So this is a—I've got one for you too, sir.

Sergeant McCormick: Thanks.

Detective Wilhelm: This is a *Miranda* warning. You know how you see on TV, you see like these cop shows? They're just TV shows. Let me tell ya, they're made up. But they slam guys against the car.

Samuel: (Nods head yes).

Detective Wilhelm: They're slamming them up against the car and then they read these rights to them. And it's kind of at the same time, sometimes they slam up against the car, put them in jail, then they read his rights. And so that's not anything like this. Alright.

Samuel: (Nods head yes).

Detective Wilhelm: These are just some rights that everyone is entitled to. Like if I were to talk to my boss or, um, someone that came to my house and said, "Man, I need to talk to you about this." I probably wouldn't but I could pull out these *Miranda* rights and, "You know what, Officer Joe, I don't want to talk to you and this is why." Okay? Does that make sense?

Samuel: Yeah. (Nods head yes).

Detective Wilhelm: Okay, so I'm gonna read them to ya, and I'll just read them in order, okay? This is [sic] Miranda warning. It says first you have the right to remain silent. Number two. Anything you say can and will be used against you in a court of law. Third. You have the right to talk to a lawyer and have them present with you while you're being questioned. Good so far?

Samuel: (Nods head yes) Um-hum.

Detective Wilhelm: Okay. So fourth [sic]. If you can't afford to hire a lawyer one will be appointed to represent you before any questioning if you wish on [sic]. So in full print there it says—you're a smart guy. So do you understand each of these rights as I've explained them to you?

Samuel: (Nods head yes).

Detective Wilhelm: <u>Do you understand those rights?</u>

Samuel: <u>Um-hum</u>.

Detective Wilhelm: <u>One through four?</u>

Samuel: <u>Um-hum</u>.

Detective Wilhelm: Okay. Would you mind signing right there?

Samuel: (Grabs pen)

Detective Wilhelm: You sure?

Samuel: Yeah.

Detective Wilhelm: Eldon, can you circle yes for me too, if you don't mind?

Samuel: Yes.

Detective Wilhelm: I didn't know you were a lefty.

Samuel: A lefty?

Detective Wilhelm: Yeah. Did you have left handed handcuffs?[1] I'm just teasing you.

Sergeant McCormick: (Laughs)

Samuel: I screwed up.

Detective Wilhelm: <u>I messed you up didn't I? Go ahead and sign. I'm sorry, I'll keep my mouth shut</u>. Can you do me another favor? How about on the date? Can you date it for me? It is still 3/24/14 or it's March 24th 2014, however you wanna write.

Samuel: 3/24?

Detective Wilhelm: 14. 2014.

Samuel: (Signing paper).

Detective Wilhelm: Okay. So hang on to that for just a second okay. Now, that was the tough part. <u>So you said that you understood each of those rights</u> ...

Samuel: ... <u>yeah</u> ...

Detective Wilhelm: ... as I explained them to you, okay? It's because I did such a great job. Secondly, this, it says having these rights in mind, do you wish to talk to us right now? Do you want to talk to me and my boss about what's going on tonight?

Samuel: Right now?

Detective Wilhelm: Yeah. That's why we're here. <u>Do you wanna talk</u>?

Samuel: Like, where will I, where will I stay?

---

[1] This joke presumably pertained to a previous interaction between Wilhelm and Samuel, during which Wilhelm spoke to Samuel about handcuffs that Samuel had brought to school. It does not appear related to Samuel's arrest for the deaths of his father and brother.

Detective Wilhelm: Just right here. We'll just chat right here.

Sergeant McCormick: Yeah, we're just gonna chat in this room.

Detective Wilhelm: No, we're not gonna keep you all night. We'll just chat right now. So, this is just – because you have, you have the right to talk to me. Like I said, <u>I have the right to talk to you, so this is just saying having these rights in mind do you want to talk to me right now</u>?

Samuel: Right now?

Detective Wilhelm: Yeah.

Samuel: Like how much time will it take?

Detective Wilhelm: It won't take long.

Sergeant McCormick: Thirty minutes to an hour tops is what I imagine.

Detective Wilhelm: Yeah, I've got stuff to do, so. <u>Do you want to chat</u>?

Samuel: <u>Sure</u>.

Detective Wilhelm: Okay. Do you want to do that [sic] same? Do you want to circle yes for me? And then can you put the date?

Samuel: Yeah.

Sergeant McCormick: Lefty, man, I love it.

Detective Wilhelm: I know, and did you see how good I did? I—I kept my mouth shut while you were signing. Okay, so I'm gonna take this real quick, okay? And so I'm gonna sign the bottom.

*State's Lodging A-5* at 29–33 (underlining added) (parentheses and alterations in original); *State's Lodging A-3* at 1:04:33 to 1:08:23. Samuel said he needed the bathroom, and officers "immediately" took him here. *Samuel*, 452 P.3d at 783.

Afterwards, the interview resumed and "lasted about four-and-a-half hours, during which Samuel made many incriminating statements." *Id*.

Before trial, Samuel moved to suppress his confession. He sought to submit a forensic report from a psychologist who had evaluated him. However, the court held that to submit the report from the defense expert, Samuel would also have to submit to a state expert. Because Samuel declined to do so, he was not permitted to offer the defense psychologist's report. *Id*. at 776.

The trial court denied the motion to suppress in a 55-page opinion. *State's Lodging A-2* at 3612–3668. The Idaho Supreme Court affirmed.

## 2. Samuel Is Not Entitled to Habeas Relief on Claim 1

In Claim 1, Samuel contends that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights. For the reasons that follow, the Court disagrees.

### A. *Clearly Established Law*

The Fifth Amendment to the United States Constitution provides, in relevant part, that "[n]o person … shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, the United States Supreme Court held that police must advise a person in custody of their rights before questioning: "[T]he person must be warned that he has a right to remain silent, that any statement he does make may be used

as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."[2] 384 U.S. 436, 444 (1966).

The Fifth Amendment right to be free from compelled self-incrimination can be waived by a person in custody, but the waiver must be voluntary, knowing, and intelligent. *Id*. The prosecution bears the burden of proving, by a preponderance of the evidence, that a *Miranda* waiver was valid. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

A valid waiver can be explicit or implicit, as *Miranda* "does not impose a formalistic waiver procedure that a suspect must follow to relinquish [his] rights." *Id*. at 384. "[T]he determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." *Fare v. Michael C.*, 442 U.S. 707, 724–25 (1979).

"The waiver inquiry has two distinct dimensions." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (internal quotation marks omitted). First, the waiver "must be

---

[2] In *Dickerson v. United States*, the Supreme Court held that the *Miranda* warnings are not mere prophylactic rules that can be overridden by a legislature but, rather, are constitutionally based. *Dickerson v. United States*, 530 U.S. 428, 438 (2000). It appears the Court has since neutered *Dickerson* without expressly overruling it, holding that a *Miranda* violation is not necessarily a constitutional violation. *Vega v. Tekoh*, 142 S. Ct. 2095, 2106 (2022). Logically, if a *Miranda* violation is not a constitutional violation, then it cannot be the basis of habeas corpus relief. However, the Court need not wade into this legal quagmire at this time. Instead, the Court will assume without deciding that, even after *Vega*, a *Miranda* claim remains cognizable on federal habeas review.

voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* (internal quotation marks omitted). With respect to the voluntary nature of the waiver, it is coercion, not "mere strategic deception," that is forbidden by *Miranda*: "Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). Whether a Miranda waiver was voluntary is a mixed question of law and fact. *Collazo v. Estelle*, 940 F.2d 411, 415–16 (9th Cir. 1991) (en banc).

Second, a *Miranda* waiver must be knowing and intelligent, meaning it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis*, 560 U.S. at 383 (internal quotation marks omitted). The suspect must understand "the basic privilege guaranteed by the Fifth Amendment." *Colorado v. Spring*, 479 U.S. 564, 575 (1987).

However, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege":

> The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect. The *Miranda* warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.

*Id*. at 574. Whether a waiver was knowing and intelligent is a question of fact. *Collazo*, 940 F.2d at 416.

"[A]dmissions and confessions of juveniles require special caution." *In re Gault*, 387 U.S. 1, 45 (1967). When the suspect being interrogated is a juvenile, the reviewing court must carefully evaluate "the juvenile's age, experience, education, background, and intelligence, and … whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Michael C.*, 442 U.S. at 725.

### B.    State Court Decision

The Idaho Supreme Court correctly set forth the appropriate analysis for determining whether a *Miranda* waiver is valid. *See Samuel*, 452 P.3d at 786 ("The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.") (citing a state court decision that cited *Fare v. Michael C.*, 442 U.S. 707). The court then went on to consider whether Samuel's waiver was voluntary, knowing, and intelligent.

The court recognized that Detective Wilhelm's explanation of the *Miranda* waiver form was "not the picture of clarity, and perhaps too casual given the gravity of the situation." *Id*. at 787. Specifically, although Wilhelm initially informed Samuel he had "the right to remain silent," Wilhelm later told Samuel—incorrectly—that Wilhelm had

"a right to talk to" Samuel. Wilhelm also downplayed the importance of the *Miranda*

waiver form, stating that "these are just some rights that everyone is entitled to" and that

he reads "to 99% of the kiddos in [his] office." *Id*. (alteration in original). Nonetheless,

the state supreme court held that the waiver was valid. Because Samuel "was provided

with the substance of the *Miranda* warnings both orally and in writing, and [he]

repeatedly showed that he understood his rights," Detective Wilhelm's "inartful

statements were not fatal to [Samuel's] *Miranda* waiver." *Id*.

Additionally, the Idaho Supreme Court relied on the following facts: that Samuel

said he got "good enough" sleep the night before, that Samuel was provided with water

and food (though he said he wasn't hungry) and "appeared calm and engaged in the

conversation and was allowed to go to the bathroom twice during the interrogation." *Id*.

Finally, "the evidence showed [that] [Samuel] was able to work independently on

schoolwork and had no trouble communicating" and that, "although he was often absent

from school, one of his teachers testified they were 'amazed' at his ability to catch up."

*Id*. Adopting the trial court's factual findings that Samuel "was at least of average

intelligence, particularly for written and oral communication," the Idaho Supreme Court

held that Samuel's *Miranda* waiver was knowing, intelligent, and voluntary. *Id*. at 787–

88. As a result, the court rejected Claim 1.

### C.    *The State Court's Rejection of Claim 1 Was Not Unreasonable under AEDPA*

The Idaho Supreme Court's rejection of Claim 1 was not contrary to, or an

unreasonable application of, clearly established Supreme Court precedent, nor was it

based on an unreasonable determination of the facts. The transcript and video of the interrogation reasonably support the state court's decision that Samuel's *Miranda* waiver was knowing, intelligent, and voluntary.

In arguing to the contrary, Samuel relies on *Doody v. Ryan*, 649 F.3d 986 (2011). In that case, the Ninth Circuit rejected, under AEDPA, an Arizona court's decision that the juvenile petitioner's *Miranda* waiver was knowing, intelligent, and voluntary. The detective giving the warnings to the juvenile suspect "significant[ly] deviat[ed]" from the printed *Miranda* form and "repeated[ly] minimiz[ed]" the significance of the *Miranda* warnings:

> During his administration of the warnings, Detective Riley emphasized that Doody should not "take them out of context," and implied to a juvenile, who had never heard of *Miranda*, that the warnings were just formalities. This misdirection was coupled with repeated assurances that the detectives did not necessarily suspect Doody of any wrongdoing. Most significantly, in informing Doody of the right to counsel, Detective Riley deviated from the form containing the juvenile *Miranda* warnings, and ad libbed that Doody had the right to counsel *if* Doody was involved in a crime. Indeed, Detective Riley instructed Doody that he had the right to counsel "if you were involved in it ... but if you were, then that's what that would apply to[.]" The implication from this improperly qualified, unclear, and confusing warning was that Doody only had the right to counsel if he were involved in a crime. In such a circumstance, the invocation of one's right to counsel would be tantamount to admitting one's involvement in a crime. Overall, the fact that Detective Riley's explanation of a one-page *Miranda* warning form consumed twelve transcribed pages of text is a testament to the confusion generated by the detective's obfuscation. When evaluated against clearly established Supreme Court precedent, the *Miranda* warnings were constitutionally deficient. At a minimum, Doody was never clearly and reasonably informed that he had the right to counsel.

> The *Miranda* warnings provided to Doody were defective
> because Detective Riley downplayed the warnings'
> significance, deviated from an accurate reading of
> the *Miranda* waiver form, and expressly misinformed Doody
> regarding his right to counsel. In view of clear, convincing
> and contrary evidence, the Arizona Court of Appeals'
> conclusion that the *Miranda* warnings were "clear and
> understandable" constituted both an unreasonable
> determination of the facts and an unreasonable application of
> clearly established federal law.

*Id*. at 1002–03 (underlining added) (internal citations omitted).

Samuel likens Detective Wilhelm's explanation of the *Miranda* form to the

detective's explanation in *Doody*. The analogy is unpersuasive.

As an initial matter, *Doody* is a Ninth Circuit case. As such, it cannot constitute

clearly established federal law for purposes of this Court's AEDPA analysis. *See Lopez*,

574 U.S. at 7. Moreover, even if *Doody* were controlling, there are significant differences

between the warnings at issue in *Doody* and Detective Wilhelm's warnings to Samuel in

this matter.

Wilhelm told Samuel (1) that he had "the right to remain silent"; (2) that

"[a]nything you say can and will be used against you in a court of law"; (3) that Samuel

had "the right to talk to a lawyer and have them present with you during questioning";

and (4) that, should Samuel be unable to afford a lawyer, "one will be appointed to

represent you before any questioning if you wish." *State's Lodging A-5* at 30. Finally,

Detective Wilhelm repeatedly asked if Samuel understood those rights, to which Samuel

repeatedly responded in the affirmative. *Id*. at 30–31. These initial warnings were clear

and precise.

While Samuel was filling out the form, Wilhelm commented on the fact that Samuel is left-handed. This comment broke Samuel's focus, and, as a result, he made a mistake on the form. *See State's Lodging A-4* (*Miranda* waiver form showing that Samuel crossed out part of his first signature on the form).

Then, in attempting to follow up on the warnings, Wilhelm told Samuel—incorrectly—that Wilhelm had a right to speak to Samuel. Wilhelm's statement, while inaccurate, is nowhere near as egregious as the statement in *Doody* that the juvenile suspect had the right to an attorney *only if* he was guilty.

Further, the *Miranda* explanation given to the defendant in *Doody* took up 12 pages of transcript. Wilhelm's explanation to Samuel took a third of that amount.

Like the police officer in *Doody*, Detective Wilhelm minimized the significance of Petitioner's Fifth Amendment right. Wilhelm stated that Samuel's situation was not at all similar to how television shows portray the *Miranda* warnings, that everyone is entitled to these rights, and that he reads the warnings to 99% of the kids at school. However, Wilhelm's explanation was not "the very antithesis of clear," as were the warnings in *Doody*, 649 F.3d at 1004.

At bottom, Detective Wilhelm explained to Samuel that he had the right to remain silent, that his statements could be used against him, that he had the right to an attorney, and that an attorney would be provided if he could not afford one. *State's Lodging A-5* at 30. Samuel waived those rights. *Id*. at 31–32; *State's Lodging A-4*. Although Wilhelm later stated, inaccurately, that Wilhelm had a right to talk to Samuel, the statement was

not so egregious as to render Samuel's waiver invalid. Thus, the Court concludes that the Idaho Supreme Court's rejection of Claim 1 was reasonable under AEDPA.

**3.      Samuel Is Not Entitled to Habeas Relief on Claim 2**

In Claim 2, Samuel asserts that his confession should have been excluded from evidence because it was involuntary.

### A.      *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment prohibits the admission of a defendant's involuntary statements, even if the defendant validly waived his *Miranda* rights before confessing:

> [C]onvictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.

*Rogers v. Richmond*, 365 U.S. 534, 540–41 (1961).

The ultimate question of the voluntariness of a confession is whether the defendant's "will was overborne by the circumstances surrounding the giving of [the] confession." *Dickerson*, 530 U.S. at 434 (internal quotation marks omitted). This inquiry "takes into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* (internal quotation marks omitted). Factors to be considered in the voluntariness analysis include (1) the age

of the suspect; (2) the suspect's education and intelligence; (3) whether *Miranda* warnings were given; (4) the length of the interrogation; (5) "the repeated and prolonged nature of the questioning"; and (6) "the use of physical punishment such as the deprivation of food or sleep." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

When the defendant is a juvenile, the youth and immaturity of the defendant is a critical factor:

> What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere [15-year-old] child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy …. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens…. Mature men possibly might stand the ordeal …. But we cannot believe that a lad of tender years is a match for the police in such a contest.

*Haley v. Ohio*, 332 U.S. 596, 599 (1948).

For example, in *Gallegos v. Colorado*, the Supreme Court held that a five-day detention of a 14-year-old suspect, during which the suspect's mother tried unsuccessfully to see him, resulted in an involuntary confession:

> [A] 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protest his own interests or how to get the benefits of his constitutional rights.
>
> … He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the

consequences of his confession were without advice as to his rights—from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14-year-old boy would not be able to know, let alone assert, such constitutional rights as he had.

370 U.S. 49, 54 (1962).

### B. State Court Decision

In Samuel's case, the Idaho Supreme Court correctly noted that whether a suspect has waived his *Miranda* rights "and whether a confession was voluntary" are somewhat "overlapping." *Samuel*, 452 P.3d at 784. The court also accurately described the totality of the circumstances test governing the voluntariness analysis, including the six factors described above. *Id.* at 788 ("Generally, these factors must be considered in determining whether a confession was given voluntarily: (1) Whether *Miranda* warnings were given; (2) The youth of the accused; (3) The accused's level of education or low intelligence; (4) The length of detention; (5) The repeated and prolonged nature of the questioning; and (6) Deprivation of food or sleep."). The court went on to consider these factors in turn.

First, the court noted that "Samuel had been given *Miranda* warnings based on his receipt of the *Miranda* waiver form and his conversation with Detective Wilhelm in which Samuel stated affirmatively that he understood each of his rights." *Id.* at 789. Second, at the time of Samuel's confession he "was 14-years and 8 months old." *Id.*

Third, with respect to Samuel's education level and intelligence:

> [The] evidence showed that [Samuel] was able to work
> independently on schoolwork and had no trouble
> communicating. Samuel was in eighth grade and, although he
> was often absent from school, after observing the
> interrogation video, there was sufficient evidence to support
> the trial court's finding that Samuel is at least of average
> intelligence, particularly for written and oral communication.

*Id.*

Fourth, the court noted that the "total time from Samuel's arrival at the police station to the conclusion of the interrogation was about five hours." *Id.* Fifth, as to Samuel's physical condition, he "was given several breaks during the interrogation and was allowed to use the bathroom," and "[t]throughout the interrogation Samuel was provided with water, and a little more than halfway through he was given pizza." *Id.*

Sixth and finally, the Idaho Supreme Court considered the nature of the questioning: "[W]hile the Detective Wilhelm and Sergeant McCormick repeated some of the same questions this appears to have been done in an effort to obtain honest answers and clarify the sequence of events." *Id.*

Based on the foregoing, the state supreme court held that Samuel's statements were voluntary.

### C.    The State Court's Rejection of Claim 2 Was Not Unreasonable under AEDPA

As with Samuel's *Miranda* claim, the transcript and video of the interrogation reasonably support the Idaho Supreme Court's decision that Samuel's confession was voluntary. For nearly half the interrogation, the detectives did not challenge Samuel's answers. And, even when they began to push back, the officers still spoke in reasonable

tones of voice. *See State's Lodging A-3; A-5.* The court's factual findings that Samuel was intelligent and a good communicator are reasonable, and the officers consistently checked in to see how Samuel was feeling physically.

Samuel had gotten "good enough" sleep the night before the interview, and during the interview he was given water and offered pizza, though he did not eat the pizza. Samuel did not have a parent with him, but this was not because the officers actively stood in the way of a parent demanding to see their child. Rather, Samuel's father was dead, and Samuel did not know how to contact his mother.[3]

After considering the totality of the circumstances, the state supreme court reasonably applied the law to the facts in this case. Accordingly, Samuel is not entitled to habeas relief on Claim 2.

## CONCLUSION

For the foregoing reasons, Samuel has not shown he is entitled to habeas relief under AEDPA. Therefore, the Petition must be denied.

## ORDER

**IT IS ORDERED:**

1.     Samuel's Petition for Writ of Habeas Corpus is DENIED, and this entire

action is DISMISSED with prejudice.

---

[3] It is true that an attorney attempted to see Samuel during the interrogation and was not allowed to do so. *Samuel*, 452 P.3d at 787. Samuel faults the Idaho Supreme Court for concluding that there was no existing attorney-client relationship at that time, *see* Dkt. 17 at 25, but Samuel has pointed to no authority requiring the police to permit an attorney to interrupt an interrogation for the purpose of establishing such a relationship.

2.     The Court does not find its resolution of this habeas matter to be reasonably

debatable, and a certificate of appealability will not issue. *See* 28 U.S.C.

§ 2253(c); Rule 11 of the Rules Governing Section 2254 Cases.


DATED:  May 24, 2023

Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge