NO. 23-35408

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

ELDON GALE SAMUEL, III,

Petitioner-Appellant,

v.

TEREMA CARLIN,

Respondent-Appellee.

---

Appeal From the United States District Court
In the District of Idaho,
The Honorable Raymond Edward Patricco, Jr., Presiding

---

RESPONDENT-APPELLEE'S ANSWERING BRIEF

---

RAÚL R. LABRADOR
Attorney General of Idaho

MARK W. OLSON*
Deputy Attorney General
Chief, Capital Litigation Unit
Criminal Law Division
P.O. Box 83720
Boise, Idaho  83720-0010
Telephone: (208) 334-4539
*Attorneys for Respondent-Appellee*

*\* Counsel of Record*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................... iii

STATEMENT OF JURISDICTION........................................................................1

STATEMENT OF ISSUES ..................................................................................2

STATEMENT OF THE CASE..............................................................................3

      Nature Of The Case ..................................................................................3

      Statement of Facts, Course of Proceedings and
      Disposition In State Court............................................................................3

      Course of Proceedings and Disposition In Federal Court.................................7

SUMMARY OF ARGUMENT .............................................................................8

STANDARD OF REVIEW ................................................................................11

LAW APPLICABLE TO FEDERAL HABEAS PROCEEDINGS ........................12

ARGUMENT ....................................................................................................17

I.     Samuel Has Failed To Establish That He Is Entitled To AEDPA Or *De
       Novo* Relief On His *Miranda* Waiver Claim............................................ 17

      A.    Samuel's *Miranda* Claim Is Precluded In Light Of *Vega v. Tekoh,*
           597 U.S. 134 (2022), Which Held That A *Miranda* Violation,
           Standing Alone, Does Not Constitute A Fifth Amendment
           Violation ................................................................................17

      B.    In The Alternative, Samuel Has Failed To Show That The Idaho
           Supreme Court's Rejection Of His *Miranda Waiver* Claim Was
           Based Upon Either An Unreasonable Determination Of Clearly
           Established Supreme Court Precedent;  Or An Unreasonable Factual
           Determination ..........................................................................20

i

II.     Samuel Has Failed To Establish That He Is Entitled To AEDPA Or *De Novo* Relief On His Coerced Confession Claim ...................................47

CONCLUSION .......................................................................................56

CERTIFICATE OF COMPLIANCE.......................................................57

CERTIFICATE OF SERVICE ................................................................59

# TABLE OF AUTHORITIES

**CASES**

Arizona v. Fulminante, 499 U.S. 279 (1991)............................................................48

Balbuena v. Sullivan, 980 F.3d 619 (9th Cir. 2020).................................................43

Bell v. Cone, 535 U.S. 685 (2002).............................................................................12

Berghuis v. Thompkins, 560 U.S. 370 (2010) ............................................ 21, 22, 23

Blackburn v. Alabama, 361 U.S. 199 (1960).............................................................48

Browning v. Baker, 875 F.3d 444 (9th Cir. 2017).....................................................11

Burt v. Titlow, 571 U.S. 12 (2013) .................................................................... 15, 16

Byrd v. Workman, 645 F.3d 1159 (10th Cir. 2011) ..................................................16

Collazo v. Estelle, 940 F.2d 411 (9th Cir. 1991)......................................................24

Collier v. Norris, 485 F.3d 415 (8th Cir. 2007)........................................................16

Colorado v. Connelly, 479 U.S. 157 (1986) ............................................... 22, 23, 48

Colorado v. Spring, 479 U.S. 564 (1987)..................................................................23

Cullen v. Pinholster, 563 U.S. 170 (2011).................................................................13

Davis v. Woodford, 384 F.3d 628 (9th Cir. 2004) ....................................................12

DeWeaver v. Runnels, 556 F.3d 995 (9th Cir. 2009) ...............................................47

Dickerson v. United States, 530 U.S. 428 (2000)....................................... 17, 21, 48

Doody v. Ryan, 649 F.3d 986 (9th Cir 2011) ............... 38, 42, 44, 44, 45, 46, 53, 53

Duhaime v. Ducharme, 200 F.3d 597 (9th Cir. 2000)...............................................13

Early v. Packer, 537 U.S. 3 (2002) ...........................................................................49

Fare v. Michael C., 442 U.S. 707 (1979).................................................... 22, 24, 32, 40

Gallegos v. Colorado, 370 U.S. 49 (1962).........................................................41, 52

In re Gault, 387 U.S. 1 (1967) ...................................................52

Gumbs v. Stanford, 2023 WL 5928454 (S.D. N.Y. 2023) ......................................18

Haley v. State of Ohio, 322 U.S. 596 (1948).........................................................40, 52

Hardaway v. Young, 302 F.3d 757 (7th Cir. 2002).................................................52

Hardy v. Chappell, 849 F.3d 803 (9th Cir. 2016)....................................................11

Harrington v. Richter, 562 U.S. 86 (2011) .......................................................14, 15

Harris v. New York, 401 U.S. 222 (1971).................................................19

Hernandez v. Ducart, 824 Fed.Appx. 491 (9th Cir. 2020) ......................................43

Hernandez v. Ducart, 2018 WL 4620701 (E.D. Cal. 2018) ....................................43

Illinois v. Perkins, 496 U.S. 292 (1990) .......................................................23, 48

Jackson v. Denno, 378 U.S. 368 (1964) ....................................................47

Johnson v. Zerbst, 304 U.S. 458 (1938) ...................................................23

Jones v. Shinn, 943 F.3d 1211 (9th Cir. 2019) ....................................................11

Kirkpatrick v. Chappell, 950 F.3d 1118 (9th Cir. 2020) ........................................16

Leavitt v. Arave, 383 F.3d 809 (9th Cir. 2004) .......................................................1

Lego v. Twomey, 404 U.S. 477 (1972) .....................................................47

Lewis v. Jeffers, 497 U.S. 764 (1990) .....................................................17

Lindh v. Murphy, 521 U.S. 320 (1997) .....................................................11

Lopez v. Johnson, 2022 WL 14708993 (C.D. Ca. 2022) ........................................43

Marshall v. Rodgers, 569 U.S. 58 (2013) .................................................13

Martinez-Villareal v. Lewis, 80 F.3d 1301 (9th Cir. 1996).....................................11

Maryland v. Shatzer, 559 U.S. 98 (2010) ...................................................................21

Miller-El v. Cockrell, 537 U.S. 322 (2003) ...............................................................15

Miranda v. Arizona, 384 U.S. 436 (1966) ....................................... 1, 18, 21, 22, 23

Moran v. Burbine, 475 U.S. 412 (1986) ....................................................................22

Price v. Vincent, 538 U.S. 634 (2003)........................................................................12

Ramirez v. Grounds, 2014 WL 6682646 (C.D. Cal. 2014) ......................................43

Rhode Island v. Innis, 446 U.S. 291 (1980) ..............................................................39

Rosas v. Montgomery, 2016 WL 1359049 (C.D. Cal. 2016)...................................43

Samuel v. Williams, 568 U.S. 289 (2013) .................................................................15

Schmerber v. California, 384 U.S. 757 (1966) ..........................................................39

Schneckloth v. Bustamonte, 412 U.S 218 (1973) .....................................................48

Shoop v. Twyford, 596 U.S. 811 (2022) ....................................................................19

Stansbury v. California, 511 U.S. 318 (1994) ...........................................................22

State v. Adamcik, 272 P.3d 417 (Idaho 2012)...........................................................40

State v. Diaz, 847 N.W.2d 144 (S.D. 2014) ..............................................................43

State v. Doe, 963 P.2d 392 (Idaho Ct. App. 1998)...............................................32, 40

State v. Doe, 50 P.3d 1014 (Idaho 2002)..........................................................32, 40, 49

State v. Doe, 948 P.2d 166 (Idaho App. 1997)..................................................... 40, 40

State v. Troy, 858 P.2d 750 (1993).............................................................................49

State v. Turner, 263 So.3d 337 (La. 2018) ................................................................43

Taylor v. Maddox, 366 F.3d 992 (9th Cir. 2004) ....................................................16

Thompson v. Runnels, 705 F.3d 1089 (9th Cir. 2013) ........................................ 3, 48

United States v. Avitan, 349 F.Supp.3d 23 (D. D.C. 2018) ...................................43

United States v. Cummings, 2022 WL 2610429 (E.D. Mich. 2022)......................43

United States v. Meza, 2016 WL 4479396 (S.D. Cal. 2016) ................................43

United States v. Vega-Arizmendi, 2017 WL 132844 (D. Virgin Islands 2017) .....43

Vega v. Tekoh, 597 U.S. 134 (2022) ................................................. 9, 17, 18, 19

Wiggins v. Smith, 539 U.S. 510 (2003)...............................................................14

Williams v. King, 875 F.3d 500 (9th Cir. 2017)......................................................1

Williams v. Taylor, 529 U.S. 362 (2000) ......................................................... 12, 13

Wood v. Allen, 558 U.S. 290 (2010) ....................................................................15

Yarborough v. Alvarado, 541 U.S. 652 (2004) .....................................................13

**STATUTES**

I.C. § 18-207(4) ......................................................................................................25

Title 28 U.S.C. § 636(c) ...........................................................................................1

Title 28 U.S.C. § 1291 ..............................................................................................1

Title 28 U.S.C. § 2241(c) ........................................................................................12

Title 28 U.S.C. § 2253 ..............................................................................................1

Title 28 U.S.C. § 2254(a) .................................................................................... 1, 17

Title 28 U.S.C. § 2254(d) .................................................................................. 12, 24

Title 28 U.S.C. § 2254(d)(2) .............................................................................. 16, 24

Title 28 U.S.C. § 2254(e)(1) ................................................................................ 3, 24

## RULES

Federal Rules of Appellate Procedure Rule 29(a)(5) ...............................................57

Federal Rules of Appellate Procedure Rule 32(a)(5) ...............................................57

Federal Rules of Appellate Procedure Rule 32(f)...................................................57

# STATEMENT OF JURISDICTION

Petitioner-Appellant's ("Samuel") Petition for Writ of Habeas Corpus ("Petition") was filed on December 1, 2020. (2-ER-97-158.) The parties consented to a Magistrate hearing the case (Dkt. 5[1]), who had jurisdiction pursuant to 28 U.S.C. §§ 636(c) and 2254(a). *See* Williams v. King, 875 F.3d 500, 504 (9th Cir. 2017). Judgment was entered denying and dismissing Samuel's habeas petition on May 24, 2023. (1-ER-2.) The magistrate court did not issue a certificate of appealability. (1-ER-31.) Samuel filed a timely notice of appeal. (Dkt. 24.) The Ninth Circuit Court of Appeals granted Samuel's motion for a certificate of appealability (9th Cir. Dkt. 1), with respect to: (1) whether Samuel knowingly, voluntarily, and intelligently waived his *Miranda*[2] rights; and (2) whether Samuel's statements to police were voluntarily made under the Fourteenth Amendment. (9th Cir. Dkt. 5.) This Court has appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. Leavitt v. Arave, 383 F.3d 809, 815 (9th Cir. 2004).

---

[1] "Dkt." refers to the district court's docket number.

[2] Miranda v. Arizona, 384 U.S. 436, 467 (1966)

1

## <u>STATEMENT OF ISSUES</u>

The Ninth Circuit Court of Appeals granted a certificate of appealability ("COA") as to both claims raised in Samuel's federal habeas petition, which he phrases in his Opening brief ("Brief") as:

    I.      Whether Fourteen-year-old Eldon Samuel knowingly, voluntarily, and intelligently waived his *Miranda* rights before police interrogated him.

    II.    Whether Mr. Samuel voluntarily made incriminating statements to the police under the Fourteenth Amendment.

(Brief, p.3.)

The state wishes to rephrase the issues as follows:

1.    Has Samuel failed to establish that he is entitled to AEDPA or *de novo* relief on his *Miranda* waiver claim?

2.    Has Samuel failed to establish that he is entitled to AEDPA or *de novo* relief on his coerced confession claim?

# STATEMENT OF THE CASE

## Nature of the Case

Eldon Gale Samuel, III appeals from the magistrate court's judgment entered on November August 2, 2023, dismissing the claims in his habeas petition. (1-ER-2.)

## Statement of Facts, Course of Proceedings and Disposition In State Court

In its opinion affirming Samuel's murder convictions on direct appeal, the Idaho Supreme Court set forth the underlying facts and procedure as follows[3]:

> Samuel was born in California in 1999. Samuel's parents had another son eleven months after Samuel was born. Samuel's younger brother was severely autistic and required significant attention. Both of Samuel's parents had prescription drug addictions which led to financial problems, criminal charges, and arrests. Throughout Samuel's childhood the family lived in shoddy, cockroach-infested residences and moved frequently, usually after they had been evicted for not paying rent. Samuel's mother started abusing pain pills following a car accident when Samuel was 4, became suicidal, and was hospitalized several times. Samuel's father became addicted to pain pills after he injured his shoulder at work. Samuel's father began to believe that a "zombie apocalypse" was inevitable. Samuel's mother testified that Samuel's father taught him how to kill zombies by playing violent video games, watching zombie themed movies, and training Samuel to use knives and guns.
>
> Samuel witnessed extreme violence growing up. When Samuel was four he watched his father pour lighter fluid on his mother and threaten to burn her alive because he wanted a settlement check she

---

[3] The state courts' factual findings are presumed to be correct. <u>Thompson v. Runnels</u>, 705 F.3d 1089, 1091-1092 (9th Cir. 2013); 28 U.S.C § 2254(e)(1).

received from a car accident. When Samuel was six he watched his father intentionally drive over his mother, breaking her collar bone. When Samuel was ten his father pointed a gun at his mother's head, bound her with duct tape, and forced Samuel to urinate on her. Child Protective Services were repeatedly contacted in California but never intervened. By 2013, Samuel's mother had left and Samuel's father moved to Idaho with Samuel and his brother. Samuel had frequent visits to the doctor for insomnia, nausea, migraines, blurred vision, and congestion.

On the evening of March 24, 2014, officers responded to a 911 call at Samuel's residence. Samuel told the operator that his brother and dad had been shot. After officers arrived on the scene Samuel was taken to the police station. After originally telling a different version of the events that evening, i.e., initially blaming his father for killing his brother, Samuel eventually described the following events during a police interrogation.

Samuel's father was on medication when he shot a .45 gun outside, believing that a "zombie apocalypse" had begun. Samuel told his father to go back inside. Once his father went inside he pushed Samuel in the chest and told him to leave. Samuel picked up his father's gun, and when his father pushed him a second time, Samuel shot him in the stomach. Samuel's father then crawled to Samuel's brother's room, leaving a trail of blood on the floor. Samuel did not believe the first shot killed his father and shot him three more times in the head once he reached Samuel's brother's room.

After killing his father, Samuel saw his brother hiding under the bed and told him to get out. His brother did not move. Samuel got a shotgun and shot his brother while he was under the bed. Samuel reloaded the shotgun and continued to shoot his brother. Samuel then dropped the shotgun and started to stab at his brother with a knife. Samuel moved the mattress off of the bed frame and got a machete. Samuel swung the machete at his brother through the gaps in the wood planks of the bed frame. When his brother tried to climb out from underneath the bed, Samuel hit him in the back of the head with the machete. Samuel continued to swing the machete as hard as he could until his brother stopped talking and was quiet. Samuel then called 911.

Originally, the State charged Samuel with two counts of first degree murder. However, after a preliminary hearing, the magistrate court found the State had not established probable cause on the premeditation element for the murder of Samuel's father. Thus, Samuel was charged with first degree murder for his brother and second degree murder for his father.

Samuel moved to suppress the statements he made during his police interrogation, arguing that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights and his statements to the police were not voluntary. In support of his motion, Samuel submitted a forensic mental health examination performed by Dr. Craig Beaver. The district court held that the admissibility of Dr. Beaver's report was conditional on Samuel submitting to a second examination that would be conducted by the State's expert. Samuel declined to meet with the State's mental health expert and the district court excluded Dr. Beaver's testimony. Ultimately, the district court denied Samuel's motion to suppress the interrogation.

The case proceeded to a lengthy jury trial. The defense theory was that Samuel killed his father in self-defense, and that he killed his brother in a rage - committing manslaughter not murder. The jury found Samuel guilty of second degree murder for killing his father, and first degree murder for killing his brother. The district court sentenced Samuel to a unified term of 15 years, with 10 years fixed, for second degree murder, and a concurrent life term, with 20 years fixed, for first degree murder. Samuel timely appealed, arguing that because of multiple errors during his trial, both individually and cumulatively, the court denied Samuel his right to a fair trial.

(3-ER-161-163.) (footnote omitted); *see also* (4-ER-288-301) (Statement of Facts and Course of Proceedings from State's Respondent's brief on direct appeal, with citations to video and transcript of Samuel's interview with police).

On direct appeal, Samuel challenged: the trial court's ruling excluding his forensic examination as evidence in support of his motion to suppress his police

interview statements; the trial court's denial of his motion to suppress, specifically, the court's conclusions that he knowingly, intelligently, and voluntarily waived his *Miranda* rights, and that his statements to police interviewers were voluntary; various evidentiary rulings; and the trial court's sentencing determination. (4-ER-381-475.)

The Idaho Supreme Court affirmed Samuel's judgment of conviction, concluding, with one exception,[4] that Samuel failed to demonstrate trial court error with respect to any of his claims. (3-ER-161-204.) With respect to Samuel's challenges to the trial court's denial of his motion to suppress, and after thoroughly analyzing and quoting from the interview transcript and the trial court's denial order, the Court affirmed the trial court's determinations that Samuel made a knowing, intelligent, and voluntary waiver of his *Miranda* rights; and that his incriminating statements to officers were voluntary and not coerced. (3-ER-171-185.) The Court denied Samuel's subsequent petition for rehearing and entered the Remittitur. (3-ER-160.) Samuel did not file a state post-conviction petition.

---

[4] The Idaho Supreme Court found harmless error with respect to one of Samuel's state-law evidentiary challenges that is not relevant to this habeas proceeding. (3-ER-191-193.)

Course Of Proceedings and Disposition In Federal Court

In December 2020, Samuel filed a habeas petition in federal district court. (2-ER-97-108.) Samuel's petition contained the following two claims: (1) his *Miranda* waiver was not entered knowingly, intelligently, and voluntarily; and (2) his statements made to the interviewing officers were coerced and not made voluntarily. (2-ER-100-106.)

The state filed an Answer and Brief in Support of Dismissal arguing that Samuel could not meet his burden under AEDPA to demonstrate that the state courts' rejection of his two claims was contrary to, or constituted an unreasonable application of, clearly established United States Supreme Court precedent; or was based upon an unreasonable factual determination. (2-ER-70-96.) Samuel filed a reply brief (2-ER-42-69), and the state filed a sur-reply brief (2-ER-33-41.)

The federal magistrate court denied and dismissed Samuel's habeas petition. (1-ER-1-31.) After summarizing and analyzing the Idaho Supreme Court's conclusions, the court found that Samuel failed to demonstrate he was entitled to AEDPA relief on either claim. (Id.)

The magistrate court chose not to issue a certificate of appealability (1-ER-31); however, the Ninth Circuit Court of Appeals granted Samuel's motion for certificate of appealability with respect to both claims he raised in his petition, whether: (1) Samuel knowingly, voluntarily, and intelligently waived his *Miranda*

rights; and whether (2) Samuel's statements to police were voluntarily made under the Fourteenth Amendment. (9th Cir. Dkt. 5.)

## SUMMARY OF ARGUMENT

With respect to his *Miranda* waiver claim, Samuel contends the Idaho Supreme Court unreasonably applied clearly established United Supreme Court precedent in affirming the trial court's conclusion that Samuel's *Miranda* waiver was voluntary. (Brief, pp.29-42.) Specifically, while acknowledging that the Idaho Supreme Court cited the correct constitutional caselaw, Samuel contends that the Idaho Supreme Court unreasonably applied that law by: (1) discounting Samuel's youth and particular characteristics and "fail[ing] to apply youth in the way that the United States Supreme Court has held it should be applied"; (2) improperly "brush[ing] aside" the impact of Detective Wilhelm's purportedly "mangled" *Miranda* warnings (and also making an unreasonable factual determination by concluding that Detective Wilhelm provided proper *Miranda* warnings); and (3) improperly "tick[ing] off the list" of relevant factors for its analysis rather than "considering them in their totality." (Id.) Otherwise, Samuel recounts his life of "turmoil and upheaval" as described by the Idaho Supreme Court in its opinion, life circumstances which, Samuel asserts, primed him to fear and obey authority figures such as the interviewing officers. (Brief, pp.29-31.)

Samuel's contention fails. Initially, the state submits that <u>Vega v. Tekoh</u>, 597 U.S. 134 (2022), which held that *Miranda* violations do not necessarily constitute Fifth Amendment violations, and therefore cannot provide a basis for 42 U.S.C. § 1983 lawsuit claims asserting a deprivation of constitutional rights, also renders such claims non-cognizable in federal habeas proceedings.

In the alternative, even if Samuel's *Miranda* claim is cognizable, a review of the state court record and applicable law reveals that, as the magistrate court correctly found, the Idaho Supreme Court, in rejecting this claim, understood and properly exercised its duty to consider Samuel's youth and particular characteristics; acknowledged and appropriately considered the "inartful" portions of Detective Wilhelm's relayed *Miranda* warnings (and concluded that they did not render Samuel's waiver invalid); and cited and applied an appropriate totality of the circumstances analysis. Further, Samuel's relayed accounts of his difficult life are cited directly from the Idaho Supreme Court's opinion – demonstrating that the Court, like the trial court, was well aware of Samuel's significant personal challenges.

With respect to his distinct (but overlapping) coerced statement claim, Samuel contends that the Idaho Supreme Court unreasonably applied clearly established United Supreme Court precedent in affirming the trial court's conclusion that Samuel's statements to police were not unconstitutionally coerced. (Brief, pp.42-

48.)  Specifically, Samuel contends that the Idaho Supreme Court: (1) did not sufficiently consider his youth, as demonstrated by its failure to "cite any of the landmark Supreme Court cases holding that a reviewing court must exercise special caution when assessing the voluntariness of a juvenile's confession"; (2) failed to expressly identify the particular traits of children that the Supreme Court has emphasized make them more vulnerable as a class; (3) failed to adequately consider his particular background and life challenges; (4) improperly dismissed the absence from the interview of a "friendly adult" as "unimportant"; (5) improperly "checked off" the relevant factors rather than "weighing all the circumstances together"; and (6) overlooked the coercive aspects of the interview, particularly where the interviewers challenged his story regarding the death of his brother.  (Id.)  Samuel also asserts, with respect to his coercion claim, that the Idaho Supreme Court made an unreasonable factual finding in concluding that he affirmatively understood and waived his *Miranda* warnings.  (Brief, p.46.)

This contention also fails.  A review of the state court record and applicable law reveals that, as the magistrate court correctly found, the Idaho Supreme Court recognized its duties under clearly established United States Supreme Court precedent to consider Samuel's youth and other relevant factors in a proper totality of the circumstances analysis.  The Court then reasonably found that, in light of the given *Miranda* warnings; Samuel's known characteristics from evidence presented

at the suppression hearing about his schoolwork, ability to communicate, and intelligence; and the lack of overbearing behavior by the interviewing officers; demonstrated that Samuel's confessions were voluntary and not unconstitutionally coerced.

## STANDARD OF REVIEW

Because Samuel's habeas petition was filed after April 24, 1996 (2-ER-97-108), it is governed by AEDPA.  Lindh v. Murphy, 521 U.S. 320, 336 (1997).  "This [C]ourt reviews de novo a [magistrate] court's decision regarding habeas relief." Jones v. Shinn, 943 F.3d 1211, 1219-1220 (9th Cir. 2019), "while applying AEDPA's 'highly deferential standards' to the last reasoned state court decision."  Browning v. Baker, 875 F.3d 444, 481 (9th Cir. 2017) (Callahan, J., dissenting in part); see also Hardy v. Chappell, 849 F.3d 803, 824 (9th Cir. 2016) (quotes and citation omitted) ("AEDPA revised the standard of review limiting a federal court's review of state court decisions which are 'contrary to, or involved an unreasonable application of, clearly established Federal law.'").  This Court may affirm the magistrate court's denial of Samuel's petition on any ground supported by the record, even if it differs from the rationale of the magistrate court.  Martinez-Villareal v. Lewis, 80 F.3d 1301, 1305 (9th Cir. 1996).

## LAW APPLICABLE TO FEDERAL HABEAS PROCEEDINGS

A petition for habeas corpus will be granted only if the petitioner alleges and proves facts showing she is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c). Habeas relief is further restricted by 28 U.S.C. §2254(d), which permits relief only if the state courts' adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The contrary to and unreasonable application clauses apply to questions of law and mixed questions of law and fact, Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2004) (citing Williams v. Taylor, 529 U.S. 362, 407-09 (2000)), and have independent meaning, Bell v. Cone, 535 U.S. 685, 694 (2002).

A state court's decision is *contrary* to clearly established federal law, as determined by the United States Supreme Court, if it (1) "applies a rule that contradicts the governing law set forth in our cases," or (2) "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405-406).

A state court's decision is an *unreasonable* application of clearly established federal law, as determined by the Supreme Court, when "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 2000). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013). In other words, circuit law can help determine whether application of a rule was unreasonable, but not what the rule is.

When deciding whether a state-court decision was "contrary to" or an "unreasonable application of…clearly established Federal law," a federal habeas court will generally consider only those Supreme Court opinions issued prior to the state court's denial of relief, however, a Supreme Court decision issued subsequently may be considered if it illustrates the proper application of a constitutional principle. Wiggins v. Smith, 539 U.S. 510, 522 (2003).

AEDPA standards are "difficult to meet," granting authority to issue the writ only in cases "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Harrington v. Richter, 562 U.S. 86, 102 (2011). Samuel "must show that the state court's ruling on the claim … was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 102. "[AEDPA] reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Id. at 102-103 (quotes and citation omitted).

Section 2254(d) does not mandate the states give a "statement of reasons" for its constitutional holdings. Id. at 99. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met

14

by showing there was no reasonable basis for the state court to deny relief." <u>Id.</u> When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Id.</u>  This principle has been extended to situations where a state court "addresses some but not all of a defendant's claims." <u>Samuel v. Williams</u>, 568 U.S. 289, 298 (2013).

Factual findings fall within two AEDPA provisions, §§ 2254(d)(2) and 2254(e)(1).  Addressing § 2254(d)(2), the Supreme Court has explained, "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).  Further, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" <u>Burt v. Titlow</u>, 571 U.S. 12, 18 (2013) (quoting <u>Wood v. Allen</u>, 558 U.S. 290, 293 (2010)).  Rather, § 2254(d)(2) requires that state courts be accorded substantial deference.  "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." <u>Wood</u>, 558 U.S. at 301 (quotes, citations, brackets, ellipsis omitted).

This standard "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court," which "was meant to be" because "AEDPA requires a state prisoner to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error beyond any possibility for fairminded disagreement." Burt, 571 U.S. at 19-20 (quotes, citations, ellipsis, brackets omitted).

Moreover, § 2254(d)(2) is "daunting" and will be "'satisfied in relatively few cases…because an 'unreasonable determination of the facts' does not, itself, necessitate relief." Byrd v. Workman, 645 F.3d 1159, 1172 (10th Cir. 2011) (quoting Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004) and Collier v. Norris, 485 F.3d 415, 423 (8th Cir. 2007).) "Rather, in order to receive relief under this clause, the petitioner must show that the state court's adjudication of the claim 'resulted in a decision that was *based on* an unreasonable determination of the facts in light of the evidence presented.'" Id. (quoting § 2254(d)(2)) (emphasis in original).

The Ninth Circuit has also explained that, irrespective of whether a claim is governed by § 2254(d)(2), "§ 2254(e)(1)'s application is not limited to claims adjudicated on the merits. Rather, it appears to apply to all factual determinations made by state courts. Thus, we defer to the [Idaho courts'] factual determinations unless [Samuel] provides clear and convincing evidence that its factual findings were wrong." Kirkpatrick v. Chappell, 950 F.3d 1118, 1131-1132 (9th Cir. 2020).

**ARGUMENT**

**I.**

**Samuel Has Failed To Establish That He Is Entitled To AEDPA Or *De Novo* Relief On His *Miranda* Waiver Claim**

Samuel contends that the Idaho Supreme Court unreasonably applied clearly established United Supreme Court precedent in affirming the trial court's conclusion that Samuel's *Miranda* waiver was voluntary. (Brief, pp.29-42.) Initially, the state submits that this claim is non-cognizable in a federal habeas petition because it does not assert a federal constitutional violation. In the alternative, Samuel has failed to show that the Idaho Supreme Court's rejection of this claim constituted an unreasonable application of clearly established United States Supreme Court caselaw, or was based upon an unreasonable factual determination.

A. Samuel's *Miranda* Claim Is Precluded In Light Of *Vega v. Tekoh,* 597 U.S. 134 (2022), Which Held That A *Miranda* Violation, Standing Alone, Does Not Constitute A Fifth Amendment Violation

Federal courts "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see also* Lewis v. Jeffers, 497 U.S. 764, 780 (1990). In 2000, the United States Supreme Court held that *Miranda* warnings were not merely a prophylactic mechanism that could be overridden by legislature, but rather, were constitutionally based. Dickerson v. United States, 530 U.S. 428, 438

17

(2000).  This appeared to mean that *Miranda* violation claims were cognizable in federal habeas proceedings.

However, Vega (which was entered in the time since briefing was completed in the underlying habeas proceeding before the magistrate court, but before the magistrate court entered its judgment), the United States Supreme Court threw "something of a monkey wrench into what had been well-settled law."  Gumbs v. Stanford, 2023 WL 5928454 at *3 n.5 (S.D. N.Y. 2023) (unpublished) (appeal filed).  In Vega, 597 U.S. at 150 (brackets and ellipses in original), the Court held, in the context of a § 1983 lawsuit, that "a violation of *Miranda* does not necessarily constitute a violation of the Constitution," and therefore, such a violation does not fall within § 1983's provision creating a cause of action against a person who subjects another to "the deprivation of [a] right … secured by the Constitution."

The Court in Vega pointed out that nowhere in the Miranda opinion did it state that the violation of its then-new custodial interview rules constituted a violation of the Fifth Amendment right against self-incrimination.  Id. at 142.  "Instead, [the Court] claimed only that those rules were needed to safeguard that right during custodial interrogation."  Id. (citing Miranda, 384 U.S. at 439.)  Further, a review of its subsequent cases revealed that the Court has repeatedly described the custodial interview rules it adopted as "prophylactic," and continuously applied Miranda and its associated rules as if they made up a court-created prophylactic mechanism (albeit

18

a constitutionally-based one), rather than a distinct and substantive constitutional right. Id. at 142-146. For example, the Court pointed to Harris v. New York, 401 U.S. 222, 224-226 (1971), in which it held that statements obtained in violation of *Miranda* could be used for impeachment purposes, even though an *involuntary* statement obtained in violation of the Fifth Amendment could not have been employed in this way. Id. at 144.

Among the additional stated justifications for its holding, the Court observed that considering of claims like Vega's "could produce 'unnecessary friction' between the federal and state court systems by requiring the federal court entertaining the § 1983 claim to pass judgment on legal and factual issues already settled in state court," and would undercut the "strong judicial policy against the creation of two conflicting resolutions based on the same set of facts." Id. at 151-152 (cleaned up, citations omitted.) This is similar to AEDPA's aim "to advance the principles of comity, finality, and federalism." Shoop v. Twyford, 596 U.S. 811, 818 (2022) (citations and internal quotation omitted).

The Court further explained, "it is easy to imagine many situations in which an un-*Mirandized* suspect in custody may make self-incriminating statements without any hint of compulsion.") Vega, 597 U.S. at 142. Thus, while the admission into trial evidence of a *coerced* and *involuntary* confession made to police clearly violates the constitution, mere errors with respect to the *giving of Miranda warnings*,

standing alone, does not. Such a distinct *Miranda* violation claim, the state submits, is therefore non-cognizable in a federal habeas proceeding.

In the present case, the magistrate court recognized the <u>Vega</u> holding, and observed that "[i]t appear[ed] the Court has … neutered *Dickerson* without expressly overruling it," and that "[l]ogically, if a *Miranda* violation is not a constitutional violation, then it cannot be the basis of habeas corpus relief." (1-ER-19.) However, the magistrate court chose not to "wade into this legal quagmire," and instead rejected Samuel's *Miranda* waiver claim on its merits after reviewing the Idaho Supreme Court's analysis. (Id.)

Therefore, in light of <u>Vega</u>, Samuel's distinct substantive *Miranda* violation claim is non-cognizable in a federal habeas petition, and this Court should affirm the magistrate court's denial and dismissal of this claim on this basis.

B.    <u>In The Alternative, Samuel Has Failed To Show That The Idaho Supreme Court's Rejection Of His *Miranda Waiver* Claim Was Based Upon Either An Unreasonable Determination Of Clearly Established Supreme Court Precedent; Or An Unreasonable Factual Determination</u>

As argued above, Samuel's distinct *Miranda* waiver claim is non-cognizable in a federal habeas proceeding. However, in the alternative, and as the magistrate court correctly concluded, the Idaho Supreme Court's rejection of this claim constituted a reasonable application of clearly established United States Supreme Court caselaw, and was not based upon an unreasonable factual determination.

Samuel, therefore, cannot show that the magistrate court erred in denying and dismissing this claim.

The Fifth Amendment privilege against self-incrimination provides that "[n]o person... shall be compelled in any criminal case to be a witness against himself." In Miranda, 384 U.S. at 467, the United States Supreme Court recognized that "without proper safeguards the process of in-custody interrogation … contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."

The Court therefore held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. at 444. Before proceeding with a custodial interrogation, a suspect must be advised of his *Miranda* rights, specifically, that he "'has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" Dickerson, 530 U.S. at 435 (quoting Miranda, 384 U.S. at 479); *see also* Berghuis v. Thompkins, 560 U.S. 370, 380 (2010).

"After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease." Maryland v. Shatzer, 559 U.S. 98, 104

(2010); Miranda, 384 U.S. at 473-474. "Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present." Shatzer, 559 U.S. at 104; Miranda, 384 U.S. at 474. "Any statements obtained during custodial interrogation conducted in violation of [*Miranda*'s] rules may not be admitted against the accused, at least during the State's case in chief." Fare v. Michael C., 442 U.S. 707, 718 (1979); *see also* Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam) ("Statements elicited in noncompliance with [Miranda] may not be admitted for certain purposes in a criminal trial.").

A suspect's waiver of these rights is valid only if it is "voluntary, knowing and intelligent." Miranda, 384 U.S. at 479. Thus, the waiver inquiry "has two distinct dimensions" - first, it must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and second, it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Thompkins, 560 U.S. at 382–383 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). A waiver satisfies this two-part standard only "if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension." Burbine, 475 U.S. at 421 (quoting Fare, 442 U.S. at 725 (1979)).

The state has the burden to prove, by a preponderance of evidence, that a defendant's Miranda waiver was valid. Colorado v. Connelly, 479 U.S. 157, 168

(1986).  The mere fact "that a *Miranda* warning was given and the accused made an uncoerced statement, … standing alone, is insufficient to demonstrate 'a valid waiver' of *Miranda* rights."  Thompkins, 560 U.S. at 384 (quoting Miranda, 384 U.S. at 475.)  "The prosecution must make the additional showing that the accused understood these rights[,]" id., meaning that his waiver was also knowing and intelligent.  "The determination of whether there has been an intelligent waiver … must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."  Johnson v. Zerbst, 304 U.S. 458, 464 (1938).  At the same time, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege.  The Fifth Amendment's guarantee is both simpler and more fundamental:  A defendant may not be compelled to be a witness against himself in any respect."  Colorado v. Spring, 479 U.S. 564, 574 (1987).

"*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust[.]"  Illinois v. Perkins, 496 U.S. 292, 297 (1990); *see also* id. at 297-298 ("Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns."); Connelly, 479 U.S. at 170 ("*Miranda* protects

defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that.").

When the suspect is a juvenile, the court is required to inquire into age-related circumstances surrounding the interrogation, including an "evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." <u>Fare</u>, 442 U.S. at 725.

A state court's determination that a defendant knowingly and intelligently waived his Miranda rights is a factual finding entitled to a presumption of correctness under 28 U.S.C. § 2254(d). <u>Collazo v. Estelle</u>, 940 F.2d 411, 416 (9th Cir. 1991) (en banc). As discussed above, this Court is required by AEDPA to defer to state-court factual findings unless they are "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Those factual findings are "presumed to be correct"; and Samuel thus has the "burden of rebutting the presumption of correctness by clear and convincing evidence". 28 U.S.C. § 2254(e)(1). The state submits that in this type of habeas case, where a federal court is reviewing state courts' balancing of various factors after the presentation of evidence, the deferential AEDPA standard creates a particularly high bar to habeas relief.

Following a hearing on Samuel's motion to suppress his statements made during the custodial interview, the trial court entered 55-page memorandum decision in which it concluded (among other determinations made regarding the interview) that, "[b]ased upon the totality of the circumstances," including "indications that he understood his *Miranda* rights," Samuel's *Miranda* waiver was knowing, intelligent, and voluntary. (5-ER-532.) The trial court not only articulated each relevant factor, but discussed each one with ample quotations and citations from the voluminous record. (5-ER-480-531.)

It is notable that in making its determinations, the state courts were limited (as the federal courts thus must also be) in the evidence that it could consider, based upon strategic choices made by Samuel. In support of his suppression motion, Samuel submitted a forensic mental health examination performed by Dr. Craig Beaver, who interviewed Samuel and several of his family members. (*See* 3-ER-163-164, 171.) As part of the report, Samuel underwent approximately five hours of neuropsychometric examinations, and Dr. Beaver reviewed numerous records. (3-ER-171.) However, the trial court excluded this evidence from its consideration because, under Idaho law, its admission was conditional to Samuel agreeing to submit to a second examination that would be conducted by a state expert. (*See* 3-ER-163-164; *see also* I.C. § 18-207(4).) After an unsuccessful motion for reconsideration on the issue, Samuel filed a notice with the court that he would not

meet with the state's mental health expert, thus guaranteeing that his forensic examination would not be considered. (*See* id.)

The trial court's determination that Dr. Beaver's report was only conditionally admissible was the basis of the first issue set forth in Samuel's Appellant's brief on direct appeal. (4-E.R.-218-229.) Samuel set forth four alternative arguments asserting trial court error with respect to this determination, and also contended that the alleged error was not harmless. (Id.) The state courts were thus left to consider, with respect to Samuel's custodial interview claims, only the argument and evidence presented at that hearing – which included a video and transcript of the interview, audio of the 911 call, testimony from the interviewing officers and teachers and employees at the Juvenile Detention Center who had interacted with Samuel, and Samuel's school records – but not any forensic interviews about Samuel's mental condition relative to the voluntariness of his *Miranda* waiver or his statements generally. (3-ER-171-185; 5-ER-477-532.)

In affirming the trial court's determination that Samuel's *Miranda* waiver was valid, the Idaho Supreme Court first summarized the facts and circumstances surrounding Samuel's interview with police, and quoted extensively from the interview itself:

> On March 24, 2014, at about 9:00 p.m., Samuel called 911 to report a shooting. Police officers arrived at Samuel's home, patted him down, and placed him in handcuffs. The officers did not ask Samuel any questions that would elicit incriminating statements during this

procedure. At about 9:40 p.m., Samuel was taken to the police station where he was placed into an interview room. One officer stayed in the room with Samuel, and a few minutes later at least two other officers entered the room. The officers proceeded to take off Samuel's bloody clothing one piece at a time and take photographs. The officers also obtained swabs from Samuel's person. During this process Samuel was asked if he needed anything and Samuel said that he would just like water. Sergeant McCormick informed Samuel that the officers were trying to make sure they preserved any evidence that may have been on Samuel's clothing, and Samuel said that he understood. Afterwards, Samuel was given new clothes, although he did not receive new underwear, socks, or shoes to wear. While removing Samuel's shoes and clothing, the officers repeatedly spoke with Samuel to ensure he was doing all right. The process to photograph, swab, and take Samuel's clothing took about 35–40 minutes.

Two officers then remained in the interrogation room with Samuel, Sergeant McCormick and Detective Wilhelm. Detective Wilhelm, who took the lead in Samuel's interrogation, was Samuel's school's resource officer. Detective Wilhelm asked some preliminary questions such as Samuel's age and contact information, if he was in any physical discomfort, when he last ate, and how well he slept the previous night. Notably, Samuel did not know his phone number or address. In response to a question about whether Samuel was experiencing any physical discomfort, he suggested that he always hurts all over. When asked what he had for dinner Samuel stated that he had two hot dogs with the bun, and two raw hot dogs around 12:00. Samuel also conveyed that he got "good enough" sleep because he takes medication.

After the preliminary matters were concluded, Detective Wilhelm gave Samuel a copy of the *Miranda* waiver form and the following discussion took place:

> Detective Wilhelm: Alright. Well, if you're okay let's get down to why-why we're here to talk today. Is that okay with you?
>
> Samuel: Yeah.

Detective Wilhelm: I'm gonna scoot forward a little bit so I can go over this with you, okay?

Samuel: Okay.

Detective Wilhelm: We didn't go over this in the office, but 99% of the kiddos in my office we give them this warning because sometimes we talk to the parents about what we're gonna talk about and sometimes we won't. Okay? So, I've actually got two of these, so I'm gonna give you that, and then I've got one and I'm gonna explain it to you, okay? So this is a – I've got one for you too, sir.

Sergeant McCormick: Thanks.

Detective Wilhelm: This is a *Miranda* warning. You know how you see on TV, you see like these cop shows? They're just TV shows. Let me tell ya, they're made up. But they slam guys against the car.

Samuel: (Nods head yes).

Detective Wilhelm: They're slamming them up against the car and then they read these rights to them. And it's kind of at the same time, sometimes they slam up against the car, put them in jail, then they read his rights. And so that's not anything like this. Alright.

Samuel: (Nods head yes).

Detective Wilhelm: These are just some rights that everyone is entitled to. Like if I were to talk to my boss or, um, someone that came to my house and said, "Man, I need to talk to you about this." I probably wouldn't but I could pull out these *Miranda* rights and, "You know what, Officer Joe, I don't want to talk to you and this is why." Okay? Does that make sense?

Samuel: Yeah. (Nods head yes).

Detective Wilhelm: Okay, so I'm gonna read them to ya, and I'll just read them in order, okay? This is [sic] *Miranda* warning. It says first you have the right to remain silent. Number two. Anything you say can and will be used against you in a court of law. Third. You have the right to talk to a lawyer and have them present with you while you're being questioned. Good so far?

Samuel: (Nods head yes) Um-hum.

Detective Wilhelm: Okay. So fourth [sic]. If you can't afford to hire a lawyer one will be appointed to represent you before any questioning if you wish on [sic]. So in full print there it says – you're a smart guy. So do you understand each of these rights as I've explained them to you?

Samuel: (Nods head yes).

Detective Wilhelm: Do you understand those rights?

Samuel: Um-hum.

Detective Wilhelm: One through four?

Samuel: Um-hum.

Detective Wilhelm: Okay. Would you mind signing right there?

Samuel: (Grabs pen)

Detective Wilhelm: You sure?

Samuel: Yeah.

Detective Wilhelm: Eldon, can you circle yes for me too, if you don't mind?

Samuel: Yes.

Detective Wilhelm: I didn't know you were a lefty.

Samuel: A lefty?

Detective Wilhelm: Yeah. Did you have left handed handcuffs? I'm just teasing you.

Sergeant McCormick: (Laughs)

Samuel: I screwed up.

Detective Wilhelm: I messed you up didn't I? Go ahead and sign. I'm sorry, I'll keep my mouth shut. Can you do me another favor? How about on the date? Can you date it for me? It is still 3/24/14 or it's March 24th 2014, however you wanna write.

Samuel: 3/24?

Detective Wilhelm: 14. 2014.

Samuel: (Signing paper).

Detective Wilhelm: Okay. So hang on to that for just a second okay. Now, that was the tough part. So you said that you understood each of those rights ...

Samuel: ... yeah ...

Detective Wilhelm:…as I explained them to you, okay? It's because I did such a great job. Secondly, this, it says having these rights in mind, do you wish to talk to us right now? Do you want to talk to me and my boss about what's going on tonight?

Samuel: Right now?

Detective Wilhelm: Yeah. That's why we're here. Do you wanna talk?

Samuel: Like, where will I, where will I stay?

Detective Wilhelm: Just right here.  We'll just chat right here.

Sergeant McCormick: Yeah, we're just gonna chat in this room.

Detective Wilhelm: No, we're not gonna keep you all night.  We'll just chat right now.  So, this is just – because you have, you have the right to talk to me.  Like I said, I have the right to talk to you, so this is just saying having these rights in mind do you want to talk to me right now?

Samuel: Right now?

Detective Wilhelm: Yeah.

Samuel: Like how much time will it take?

Detective Wilhelm: It won't take long.

Sergeant McCormick: Thirty minutes to an hour tops is what I imagine.

Detective Wilhelm: Yeah, I've got stuff to do, so.  Do you want to chat?

Samuel: Sure.

Detective Wilhelm: Okay.  Do you want to do that [sic] same?  Do you want to circle yes for me?  And then can you put the date?

Samuel: Yeah.

Sergeant McCormick: Lefty, man, I love it.

Detective Wilhelm: I know, and did you see how good I did? I-I kept my mouth shut while you were signing. Okay, so I'm gonna take this real quick, okay? And so I'm gonna sign the bottom.

Afterwards, Samuel said he had to go to the bathroom, and was immediately taken to the bathroom. The interrogation lasted about four-and-a-half hours, during which Samuel made many incriminating statements.

(3-ER-171-175; *see also* SER-32-26 (corresponding portion of interview transcript).)

The Idaho Supreme Court next recognized the applicable *Miranda* waiver law consistent with that set forth by the state above. (3-ER-176-178.) This included a reliance on Idaho cases which had analyzed the validity of *Miranda* waivers in the context of juvenile suspects. (Id. (citing State v. Doe, 50 P.3d 1014 (Idaho 2002); State v. Doe, 963 P.2d 392 (Idaho Ct. App. 1998).) Both of these cases cited and utilized the relevant factors as set forth in Fare, 442 U.S. at 725. Doe, 50 P.3d at 1018-1019; Doe, 963 P.2d at 395-396.

The Court then found that the trial court "properly addressed all of the necessary factors on whether there was a valid *Miranda* waiver and whether Samuel's confession was voluntary," including Samuel's age and maturity, experience, education, intelligence, background, access to a parent or supportive adult, whether *Miranda* warnings were given, capacity to understand the warnings, the nature of his rights and the consequences of the waiver, length of the detention

and repeated and prolonged nature of questioning, deprivation of food or sleep, and the presence of coercive interrogation tactics. (3-ER-177.) The Court also rejected Samuel's appellate argument that the trial court shifted the burden to Samuel to prove he did not understand the *Miranda* warnings, and recognized that instead, the trial court specifically recognized that "[t]he [s]tate has the burden to provide substantial evidence to demonstrate that under the circumstances [Samuel] voluntarily, knowingly, and intelligently waived his *Miranda* rights." (3-ER-178; *see also* 5-ER-506-507 (the trial court recognizing this burden).)

Ultimately, the Idaho Supreme Court held that, based upon its review of the evidence presented at the suppression hearing, and of the trial court's on-the-record analysis, the trial court properly concluded that Samuel "was at least of average intelligence, particularly written and oral communication," that Samuel had failed to demonstrate on appeal that Detective's Wilhelm's warnings were misleading or that he did not understand them when he signed the waiver, and that the trial court "correctly considered the totality of the circumstances and concluded that Samuel's waiver of his *Miranda* rights was valid." (3-ER-181.) A review of the record supports the reasonableness of the state courts' application of relevant precedent and factual determination regarding the validity of the waiver.

First, as the Idaho Supreme Court correctly observed, after Samuel had been in the interrogation room for about an hour, Detective Wilhelm gave him a copy of

the *Miranda* form and read Samuel an appropriate *Miranda* warning. (3-ER-179-180; SER-32-33.) Detective Wilhelm then confirmed Samuel understood his rights, and provided Samuel a written *Miranda* waiver, which Samuel signed. (3-ER-180; *see also* 5-ER-658 (signed *Miranda* waiver form). Before this, Detective Wilhelm went over Samuel's *Miranda* rights, one by one, in a friendly tone. (*See* Video Exhibit[5], 1:04:30-1:08:24; SER-32-36.) Detective Wilhelm made it clear that the officers were not "slamming" Samuel up against a car, like they do on television – he thus signaled to Samuel near the very start that he would not be subjected to coercive tactics such as that Samuel may be familiar with from fictional portrayals of police interviews. (Id.) He provided an example of how *Miranda* rights can be invoked in order to decline to participate in a police interview – explaining that if an officer came to Detective Wilhelm's house to talk to him, he "could pull out these Miranda rights and [say], 'You know what, Officer Joe, I don't want to talk to you and this is why." (Video Exhibit, 1:05:28-1:05:42; SER-33.) Detective Wilhelm also frequently stopped and asked Samuel if he understood these rights – Samuel

---

[5] Approximately contemporaneous with the filing of his Opening brief, Samuel filed a motion (9th Cir. Dkt. 13), pursuant to Ninth Circuit Rule 27-14, to transmit to this Court the video of Samuel's custodial interview, which was admitted at trial as State's Exhibit 6A (7-ER-994-995), and lodged with the federal magistrate court as State's Lodging A-3 (Dkt. 11, p.2). This motion is pending before this Court, and the state does not object to it. This video is cited to in this brief as "Video Exhibit." A review of the video itself supports the state courts' determinations about the interviewing officers' non-coercive demeanor and physical placement.

validated these efforts by indicating, numerous times, verbally and with nodding, that he understood the rights. (Video Exhibit, 1:04:30-1:08:24; SER-32-36.) Detective Wilhelm even asked if Samuel was "sure" before he signed the form. (SER-34.)

In general, a review of the transcript and video of the interview reveals the reasonableness of the trial court's observation that "the officers were polite and considerate of [Samuel], that the officers respected [Samuel's] personal space, and that overall the interrogation tactics employed did not overbear [Samuel's] will." (5-ER-527; *see also* Video Exhibit; SER-4-196.) Indeed, the officers appear to have taken great pains to be non-threatening and put Samuel at ease, including by asking Samuel permission to "scoot forward a little bit" so the *Miranda* form could be explained to him, and by reminding him (several times) to breathe. (*See* Video Exhibit, 1:04:30-1:08:24; SER-32-36, 42.) Before signing, Samuel felt comfortable enough to ask several questions of the interviewing officers, which they answered. (SER-32-37.) Even towards the end of the interview, Samuel still felt comfortable enough to smile and joke with the officers, standing up and responding "this tall" when asked how tall he was. (Video Exhibit, 4:04:03-4:04:12; SER-180.)

At the outset of their contact with Samuel, while the officers were gathering evidence from Samuel's clothes, Detective Reneau made it clear that if Samuel needed anything or was worried about anything he could talk to him. (Video

Exhibit, 3:38-3:45; SER-6.)  During the collection of Samuel's clothes, the officers made it clear that if Samuel had any questions he should ask.  (Video Exhibit, 13:18-13:34; SER-10 ("Okay.  If you have any questions don't hesitate to ask me, alright?").)

Further, as the trial court found, while the officers had to take his clothes for evidentiary purposes (a need which, importantly, they explained to Samuel, rather than leaving him with the impression that it was an act intended to intimidate him), they also "immediately" provided Samuel with fresh clothes they had retrieved from his home, and made a "concerted effort to keep [Samuel] comfortable and maintain his privacy."  (5-ER-524) (footnote omitted); (*see also* SER-12.)  While the officers did not provide underwear, shoes, or socks, the trial court found that these items were not withheld in an effort to demean or embarrass Samuel, rather, it instead appeared that the officers simply did not have those items to provide (and importantly, this was also explained to Samuel).  (Id.; *see also* SER-18.)  There is no indication in the record that this lack of a full change of clothes somehow contributed to any involuntary *Miranda* waiver or statement.

Regarding his physical condition, Samuel told officers that while he "always hurts all over," he got "good enough" sleep the night before; he was provided with water throughout the interview, was permitted to go to the bathroom, was given several other breaks, and was offered pizza about three hours into the interview,

which lasted approximately four-and-a-half hours.  (3-ER-172, 180, 184; SER-20, 24.)

Of the statements made by the officers over the course of the interview, Samuel, on appeal (Brief, pp.10-13, 34-35, 39), emphasizes Detective Wilhelm's statement made at the conclusion of his explanation of the *Miranda* warnings, that he had "the right to talk to [Samuel]," just as Samuel had "the right to talk to [Detective Wilhelm]."  (SER-35.)  The Idaho Supreme Court noted that some of Detective Wilhelm's statements, including this one (which it quoted in its opinion), "were not the picture of clarity, and perhaps too casual given the gravity of the situation."  (3-ER-180.)  However, the Court found, this was not "fatal to Samuel's *Miranda* waiver" in light of the ample evidence of validity.  (Id.)

As the trial court recognized (5-ER-523), Detective Wilhelm's statement at issue was not an accurate statement of the law, nor did it (like some of Detective Wilhelm's other comments) highlight the most important part of the *Miranda* warnings – that Samuel had the right not to speak with the interviewing officers, and the right to talk with an attorney.  However, the statement, even taken in isolation, was not as potentially dangerous to the voluntariness of Samuel's waiver as Samuel contends.

The statement must be viewed in context of the conversation that surrounded it.  It occurred at the conclusion of Detective Wilhelm's explanation of the *Miranda*

rights, after Samuel had already signed the *Miranda* form, and after Samuel indicated multiple times that he understood his rights. (SER-32-36.) Before and after the statement, Samuel asked Detective Wilhelm several questions regarding when and where the interview would take place, and how long it would take. (Id.)

Immediately after the statement, Detective Wilhelm asked Samuel, "having these rights in mind do you want to talk to me right now?" (SER-35) – a question that there would be no reason to ask if either a conversation was required, or if either party in the conversation perceived or intended Detective Wilhelm's statement as relaying such. Further, Samuel's questions and responses made immediately before and after Detective Wilhelm's statement do not indicate that the statement somehow altered Samuel's understanding of his rights, or his willingness to talk to the officers. Instead, Samuel was comfortable enough to continue asking questions after the statement, and to request a bathroom break (which was granted). (SER-35-37.)

Further, while legally inaccurate, Detective Wilhelm's statement was not nearly as problematic as the erroneous statements made by interviewing officers to a juvenile murder suspect in <u>Doody v. Ryan</u>, 649 F.3d 986 (9th Cir 2011), a case involving a 17-year old mass murder suspect, which Samuel relies upon and extensively compares to the circumstances of the present case, including with respect to how the *Miranda* warnings were provided. (Brief, pp.18-19, 36, 38-42, 47-48).

In <u>Doody</u> (which is both distinguishable, and, pursuant to AEDPA, as discussed above, of limited application to a federal habeas review of a state court's conclusions because it is a federal circuit case), the interviewing officer: (1) told Doody he was required to tell the detectives what happened ("its [sic] so important for you, for you to tell us. *I mean you have to tell us. You have to.*") (emphasis in opinion); and (2) implied to Doody that he "only had the right to counsel if he were involved in a crime." <u>Id.</u> at 993, 1003. If the latter was true, the Ninth Circuit Court of Appeals noted, the invocation of one's right to counsel would be tantamount to admitting one's involvement in a crime, <u>id.</u> at 1003, and thus, as the concurring opinion observed, such a warning was worse than no warning at all, <u>id.</u> at 1026 (Kozinski, J., concurring).

Detective Wilhelm's inartful statement did not pose the same risks to the validity of Samuel's *Miranda* waiver as did the officer's statement in <u>Doody</u>. This is, in part, because the statement was not *entirely* inaccurate. An invocation of *Miranda* only prevents an officer from interrogating a suspect, which means asking questions that are reasonably likely to elicit an incriminating response. *See, e.g.*, <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-301 (1980). The Fifth Amendment privilege against self-incrimination protects an accused only from being compelled to testify against himself, or otherwise providing the State with evidence of a testimonial or communicative nature. <u>Schmerber v. California</u>, 384 U.S. 757, 761

(1966). It does require the police to be silent, or to refrain from attempting to speak with suspects. While not most accurately described as a "right," the officers had the lawful authority to attempt to engage in conversation with Samuel and to seek a *Miranda* waiver. The statement would have been more potentially confusing if Detective Wilhelm relayed that he had some right to engage in a back-an-forth discussion with Samuel.

Overall, the statement, when considered in full context and under the totality of circumstances, does not invalidate the *Miranda* waiver, and it was not an unreasonable application of any clearly established United States Supreme Court precedent for the state courts to so conclude.

To address another of Samuel's challenges on appeal, the state courts were clearly not ignorant of their duty to consider Samuel's youth. The state courts collectively cited and analyzed State v. Doe, 948 P.2d 166, 159 (Idaho App. 1997), Doe, 50 P.3d at 1018, and Doe, 963 P.2d at 395, three Idaho appellate cases applying controlling federal constitutional standards for evaluating the validity of the voluntariness of juvenile *Miranda* waivers and confessions; and also cited State v. Adamcik, 272 P.3d 417, 440 (Idaho 2012) and Fare v. Michael C., 442 U.S. at 725, two other juvenile confession cases pertaining to *Miranda* waivers (3-ER-178-180; 5-ER-505-510). Additionally, Doe, 948 P.2d at 171-173 quoted from Haley v. State of Ohio, 322 U.S. 596, 599-600 (1948), a Supreme Court case which specifically

recognized the "special care in scrutinizing the record" that is required when analyzing the interrogation of a juvenile.  Doe I, 948 P.2d at 171 also quoted from and discussed Gallegos v. Colorado, 370 U.S. 49, 54 (1962), another Supreme Court case recognizing the particular mandatory duties in analyzing juvenile interrogations; and also cited numerous other juvenile interrogation cases from other jurisdictions.

With respect to Samuel's personal characteristics, the state courts were, as discussed above, limited by Samuel's decision not to participate in a state forensic examination, which in turn precluded the admission of Dr. Beaver's forensic examination.  Still, the Idaho Supreme Court specifically noted Samuel's age, and his performance at (including absences from) school; and that the trial court specifically considered youth-based factors including Samuel's "age and maturity, experience, education, intelligence, background, access to a parent or supportive adult … [and] capacity to understand the [Miranda] warnings."  (3-ER-177, 181, 184.)  The Court also considered Samuel's appellate argument that his age, immaturity, and lack of education "amplified the deficiency of the warnings and the coercive force of the officers' tactics," but found that "[a]t the time of the interrogation Samuel was 14-years and 8 months old, and the evidence showed he was able to work independently on schoolwork and had no trouble communicating." (3-ER-181.)

The Court's conclusion was based upon trial court factual findings which followed the court's review of several grade level assessments and the testimony of several teachers. (5-ER-511-515.) While he was often absent from school, one of his teachers testified they were "amazed" at Samuel's "ability to catch-up." (5-ER-513.) The trial court also considered a report from one of Samuel's teachers at juvenile corrections indicating that Samuel "has no problems communicating, reading, writing, responding to conversation, or discussion questions he has about the curriculum." (Id.) The court also made the observation (which the state submits is supported by a review of the video exhibit), that throughout the police interview, Samuel "was engaged and generally able to answer the officers' questions," and even "used somewhat sophisticated words and terminology." (5-ER-514.) The trial court concluded, "[b]ased upon the totality of the evidence discussed above and based upon the Court's observation of the video recording of the interrogation, the Court finds that [Samuel] is of at least average intelligence, particularly with regards to written and oral communication." (Id.)

As noted above, Samuel substantially relies upon (for both of the issues before this Court), as persuasive authority, Doody, 649 F.3d 986, in which the Ninth Circuit Court of Appeals reversed and remanded a federal district court's order denying Doody's habeas petition. As in the present case, Doody, a juvenile, challenged the admission of incriminatory statements made during a custodial interrogation on the

grounds that his *Miranda* waiver was invalid, and that his confessions were not made voluntarily. Doody 649 F.3d at 1002-1021. Overall, the Ninth Circuit Court of Appeals described the "extraordinarily lengthy interrogation of a sleep-deprived and unresponsive juvenile under relentless questioning for nearly thirteen hours by a tag team of detectives, without the presence of an attorney, and without the protections of proper *Miranda* warnings." Id. at 1009.

In light of its conclusion that the petitioner was entitled to a writ of habeas corpus even under the deferential AEDPA standards, Doody is often cited by juvenile defendants and habeas petitioners. However, due to its extraordinary and disturbing facts, and sparse analysis from the underlying state appellate court opinion which was found to have unreasonably applied clearly established United States Supreme Court precedent, it is often distinguished.[6] It is also easily

---

[6] *See e.g.*, United States v. Cummings, 2022 WL 2610429 at *8 (E.D. Mich. 2022) (unpublished); Lopez v. Johnson, 2022 WL 14708993 at *10 n.12 (C.D. Ca. 2022) (unpublished); Balbuena v. Sullivan, 980 F.3d 619, 633-634 (9th Cir. 2020); Hernandez v. Ducart, 824 Fed.Appx. 491, 493-494 (9th Cir. 2020) (unpublished); State v. Turner, 263 So.3d 337, 397 (La. 2018); Hernandez v. Ducart, 2018 WL 4620701, *15 (E.D. Cal. 2018) (unpublished); United States v. Avitan, 349 F.Supp.3d 23, 37-38 (D. D.C. 2018); United States v. Vega-Arizmendi, 2017 WL 132844, *6 n.7 (D. Virgin Islands 2017) (unpublished); United States v. Meza, 2016 WL 4479396, *4-5 (S.D. Cal. 2016) (unpublished); Rosas v. Montgomery, 2016 WL 1359049, *9 (C.D. Cal. 2016) (unpublished); Ramirez v. Grounds, 2014 WL 6682646, *13-15 (C.D. Cal. 2014) (unpublished); State v. Diaz, 847 N.W.2d 144, 158-159 (S.D. 2014).

distinguishable from the present case, with respect to both of Samuel's claims before this Court.

During his interrogation, Doody confessed to participating in a series of murders. Doody, 649 F.3d at 990-991. He was eventually convicted. Id. The Ninth Circuit Court of Appeals concluded that Doody was entitled to a writ of habeas corpus on his claims that he received inadequate *Miranda* warnings prior to his confessions, and that his *Miranda* waiver was not valid. Id. at 1002-1007. The Court explained, "[w]hat began as the reading of a single-page *Miranda* form morphed into a twelve-page exposition that negated the intended effect of the *Miranda* warning." Id. at 991. The investigating detective began by informing Doody that the warnings were merely a formality that Doody should not "take out of context." Id. at 991-992.

As discussed above, the Court identified at least two legal errors in the detective's explanation of the *Miranda* warnings: One, that Doody was required to tell the detectives what happened ("its [sic] so important for you, for you to tell us. *I mean you have to tell us. You have to.*") (emphasis in opinion); and two, by implying "that Doody only had the right to counsel if he were involved in a crime." Id. at 993, 1003. If the latter was true, the Court noted, the invocation of one's right to counsel would be tantamount to admitting one's involvement in a crime. Id. at 1003. Overall, the Court found, the fact that the detective's explanation of a one-

page *Miranda* warning form consumed twelve transcribed pages of text was a testament to the confusion generated by the detective's obfuscation and was the "very anthesis of clarity." Id. at 1006.

The custodial interrogation of Samuel was entirely different. The detective's explanation and recitation of the *Miranda* warnings, and Samuel's signing of the *Miranda* warning form and return of the signed form to the detective, consisted only of three full pages in the interrogation transcript, and parts of two other pages (unlike the 12 transcribed pages in Doody, which also demonstrated a significant deviation from the text of the form). (SER-32-36.) As the Idaho Supreme Court found, Samuel was provided with the substance of the *Miranda* warnings both orally and in writing, and repeatedly showed that he understood his rights by answering the detective's questions. (3-ER-179-180.) Unlike in Doody, the only diversion from the detective's verbatim reading of the *Miranda* warnings was to ask Samuel whether he was "good so far," which the trial court reasonably considered to be a "colloquial manner of checking for understanding." (5-ER-490; *see also* SER-33.)

In Doody, the Ninth Circuit Court of Appeals also found it problematic that the Arizona Court of Appeals, which had affirmed the trial court's denial of Doody's motion to suppress, entirely failed to mention many of the factors which weighed in favor of a finding that Doody's *Miranda* waiver and confessions were involuntary. Doody, 649 F.3d at 1009, 1012, 1013, 1015. There are no such issues in the present

case. First, the trial court made extensive factual findings that were relied upon by the Idaho Supreme Court, covering 23 pages of its Memorandum Decision. (5-ER-477-499.) In its analysis, the Idaho Supreme Court, as discussed above, acknowledged the relevant factors, including those problematic portions of the interview which Samuel highlights on appeal.

Samuel also argues, as he did in state court and to the federal magistrate court, with respect to both his *Miranda* waiver and coercion claims, that the trial court and Idaho Supreme Court unreasonably applied controlling precedent by considering the evidence in piecemeal fashion rather than weighing all of the evidence in totality. (Brief, pp.36, 46-48.) The Idaho Supreme Court expressly recognized this argument (3-ER-175), quoted from the trial court's multiple express recognitions of the totality of circumstances standard (3-ER-176, 177, 184), and reasonably found that the trial court properly applied this standard in informing its decisions on both issues (3-ER-177, 181, 184-185). By discussing each factor, the state courts did more than the "tick[] off the list of circumstances" as did the Arizona Court of Appeals in Doody. Doody, 649 F.3d at 1011. A court does not unreasonably apply a totality of the circumstances standard by discussing and analyzing the factors individually – this is an efficient, fair, and necessary way to assure that all factors are acknowledged and considered. There is no indication in the record that the trial court or Idaho Supreme Court failed apply the cumulative analysis they expressly stated that they were

applying; therefore, Samuel's argument essentially amounts to disagreements with the organizational formats of the state courts' decisions.

For these reasons, and given the deference afforded to the state courts' adjudication of his *Miranda* waiver claim, Samuel has failed to demonstrate that the magistrate court erred in concluding that the Idaho Supreme Court's rejection of this claim was either contrary to, or based upon an unreasonable application of, clearly established federal law; or that the state courts' conclusion that his *Miranda* warning was valid constituted an unreasonable factual determination. For all of the same reasons as discussed above, the state also submits that this claim fails even under *de novo* review.

## II.

### Samuel Has Failed To Establish That He Is Entitled To AEDPA Or *De Novo* Relief On His Coerced Confession Claim

Involuntary or coerced confessions are inadmissible at trial, because their admission is a violation of a defendant's right to due process under the Fourteenth Amendment. Lego v. Twomey, 404 U.S. 477, 478 (1972); Jackson v. Denno, 378 U.S. 368, 385-86 (1964)); *see also* DeWeaver v. Runnels, 556 F.3d 995, 1002-1003 (9th Cir. 2009) ("A confession must be suppressed, even absent a *Miranda* violation, when the totality of the circumstances demonstrates that the confession was involuntary.").

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Connelly, 479 U.S. at 167; *see also* Thompson v. Runnels, 705 F.3d 1089, 1097 (9th Cir. 2013) ("Police interrogation tactics that do not rise to the level of coercion do not make a confession involuntary."). Coercive police conduct can be the result of either physical intimidation or psychological pressure. Arizona v. Fulminante, 499 U.S. 279, 287-288 (1991); Blackburn v. Alabama, 361 U.S. 199, 206 (1960). "Coercion is determined from the perspective of the suspect." Perkins, 496 U.S. at 296. The test for determining whether a confession is involuntary is whether a defendant's will was overborne by the circumstances surrounding the giving of a confession, taking into consideration the totality of all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation. Dickerson, 530 U.S. at 434 (citations and internal quotations omitted).

Relevant factors in a totality of the circumstances analysis of whether a defendant's will was overborne in a particular case include: (1) whether *Miranda* warnings were given; (2) the youth of the accused; (3) the accused's level of education or low intelligence; (4) the length of detention; (5) the repeated and prolonged nature of the questioning; and (6) deprivation of food or sleep. Schneckloth v. Bustamonte, 412 U.S 218, 226 (1973).

As is evident from the description of the applicable caselaw and the state's arguments above with respect to Samuel's *Miranda* waiver claim, there is considerable overlap between an analysis of whether a *Miranda* waiver was valid, and an analysis of whether custodial interrogation statements themselves were made voluntarily. The state therefore adopts all of the arguments set forth above with respect to Samuel's *Miranda* waiver claim to the extent they also apply to Samuel's involuntary confession claim.

The Idaho Supreme Court recognized the overlap of relevant factors in this case, but, like the trial court (5-ER-505-525), also recognized that Samuel raised two distinct claims, each governed by a distinct body of relevant precedent (3-ER-176, 181-185). The Court set forth the applicable law and relevant factors governing coerced confession claims, all consistent with that set forth by the state above, and expressly cited and applied the six factors noted above from Schneckloth.[7] (3-ER-181-185.)

_____

[7] While the Idaho Supreme Court did not cite Schneckloth directly, it cited Doe, 50 P.3d at 1018 and State v. Troy, 858 P.2d 750, 753 (1993) (3-ER-181-182), which both cited Schneckloth and the factors contained therein – including the accused's youth and level of education. The trial court also expressly considered all of the Schneckloth factors (among others). (5-ER-510-520.) Even so, avoiding the legal "pitfalls" of AEDPA "does not require citation of [United States Supreme Court] cases – indeed, it does not even require *awareness* of [the Supreme Court's] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (emphasis in original).

In rejecting Samuel's coercion claim, the Idaho Supreme Court held that the trial court properly considered the requisite factors and did not err when it determined that Samuel's confession was voluntary. (3-ER-185.) The Court reasoned:

> First, Samuel had been given *Miranda* warnings based on his receipt of the *Miranda* waiver form and his conversation with Detective Wilhelm in which Samuel stated affirmatively that he understood each of his rights. Second, at the time of the interrogation Samuel was 14-years and 8 months old, and evidence showed that he was able to work independently on schoolwork and had no trouble communicating. Samuel was in eighth grade and, although he was often absent from school, after observing the interrogation video, there was sufficient evidence to support the trial court's finding that Samuel is at least of average intelligence, particularly for written and oral communication.
>
> The total time from Samuel's arrival at the police station to the conclusion of the interrogation was about five hours. Samuel was given several breaks during the interrogation and was allowed to use the bathroom. Throughout the interrogation Samuel was provided with water, and a little more than halfway through he was given pizza. Further, while Detective Wilhelm and Sergeant McCormick repeated some of the same questions this appears to have been done in an effort to obtain honest answers and clarify the sequence of events.

(3-ER-184.)

The Court also quoted from the trial court's summary conclusion in which it found that, based upon its own observation of the interrogation video, the officers were "polite and considerate" of Samuel, "respected [Samuel's] personal space," and that overall, "the interrogation tactics employed did not overbear [Samuel's]

will." (Id.; *see also* 5-ER-527-528 (relevant portion of trial court memorandum order).)

As the trial court also observed, Samuel remained "calm and engaged" and the officers were never abusive or threatening to Samuel in any way. (5-ER-525-526.) Samuel remained calm even when the officers began to confront him about the inconsistencies and holes in his initial account of events. (5-ER-528.) Even when Detective Wilhelm began challenging Samuel's fabrication, he did it politely and apologized:

> [Detective Wilhelm]: But, and I apologize [Samuel], if I'm not asking this the right way. So how do you know if you weren't in [J.S.'s] room how do you know he was in the room?

(Video Exhibit, 1:54:50-1:55:05; SER-81.)

The officers also used a pleasant tone of voice, and stayed seated, when Sergeant McCormick continued to question Samuel about his brother. (*See* Video Exhibit, 2:03:05-2:03:37; SER-89.) The officers' encouragement to Samuel for him to be honest, and their expressed skepticism about his initial account of the murders, did not constitute unlawful coercion or render Samuel's admissions involuntary.

While it is true that Samuel did not have a parent present during the interview, which is an important consideration in analyzing the voluntariness of confessions made by juveniles, this was understandable in this case given the circumstances. Samuel's father was dead. When the officers asked Samuel for his

mother's information, Samuel did not know her phone number in California, was not entirely sure how to spell her last name, and was not sure what city she lived in. (*See* Video Exhibit, 1:37:51-1:39:50; SER-61-63.) Still, the Idaho Supreme Court considered the absence of a "friendly adult" in its analysis. (3-ER-180-181.) This was all that was required – while the United States Supreme Court has "spoken of the need to exercise 'special caution' when assessing the voluntariness of a confession, particularly when…the interrogation occurs in the absence of a parent, lawyer, or other friendly adult," Hardaway v. Young, 302 F.3d 757, 762 (7th Cir. 2002) (citing In re Gault, 387 U.S. 1 (1967); Gallegos, 370 U.S. at 53-55; Haley, 332 U.S. at 599-601)), it has never held that a "friendly adult" is *required* in order to render a juvenile's interrogation statements voluntary, or that interviewing officers must procure a friendly adult to consult with the juvenile during the interview.[8]

While the length of the questioning was about four and half hours, and the total time Samuel was present at the police department before the termination of the

_____

[8] Nearly three hours into the officers' interrogation, the attorney who would later represent Samuel arrived at the police station and asked to see Samuel. (3-ER-181; 5-ER-498-499, 528.) However, there was no prior attorney-client relationship between Samuel and the attorney, the attorney was denied access, and Samuel was not told of the attorney's presence. (3-ER-181; 5-ER-528-529.) Citing controlling United States Supreme Court precedent, and declining Samuel's request to interpret the Idaho Constitution as providing greater protection under these circumstances, the trial court rejected Samuel's argument that the officers were required to tell Samuel of the attorney's presence. (5-ER-529-531.)

interrogation was about five hours, the trial court found that Samuel "was given several breaks during the interrogation and was allowed to use the bathroom." (5-ER-519.) While the length of the interview was substantial, Samuel was not deprived of sleep or food, nor is there any indication in the video of the interview that the length of time rendered any of Samuel's statements involuntary.

Just as Samuel's reliance upon Doody, 649 F.3d 986 with respect to his *Miranda* waiver claim was misplaced (as discussed above), his reliance on that case in support of his involuntary confession claim is misplaced as well. The Ninth Circuit Court of Appeals held that Doody was entitled to a writ of habeas corpus on his involuntary confession claim. Id. at 1007-1021. The Court noted that in the middle of the night, Doody became virtually non-responsive to the detectives' questioning. Id. at 993. The Court made much of the fact that numerous questions were asked, repeated, and repeated again (some questions repeated up to 25 times), over long periods of time, without any response from Doody at all. Id. at 993-994, 1011-1014. During these periods of time, Doody's "posture began to deteriorate. His attentiveness also deteriorated. And his eye contact dropped to where he would look at the ground for long periods of time. He would clinch his beret in his hand." Id. at 1000. The Court reasoned that "[i]n view of the fact that [they were] considering the questioning of a sleep-deprived juvenile subjected to nearly thirteen

hours of uninterrupted interrogation, the degree of Doody's responsiveness is a pivotal concern." Id. at 1012.

Doody's interrogation went overnight, from 9:25 PM to 10:00 AM the next day. Id. at 991. The first break occurred over nine hours into the interrogation. Id. at 1011. Doody was forced to sit in straight-back chair without even a table to lean upon. Id. at 1009. Additionally, the same task force that questioned Doody had previously questioned four adult men, each of whom had ultimately provided, as conceded by the state, false confessions. Id. at 1013. By the end of the interrogation, Doody "was sobbing almost hysterically." Id. at 1015. "[O]ver twelve hours of insistent questioning of a juvenile by tag teams of two, three and four detectives became menacing and coercive rather than 'courteous.' … Indeed, at times the tones of the detectives [we]re downright chilling." Id. at 1013.

As in the context of the *Miranda* violation analysis, Samuel's interrogation was not remotely like Doody's. With respect to alleged coercion from the detectives, a review of the interrogation transcript and video does not reveal *any* substantial periods of non-responsiveness, let alone the lengthy and repeated periods of non-responsiveness described in Doody. (*See* Video Exhibit; SER-4-196.) The Idaho Supreme Court quoted from the trial court's conclusions that were based upon the court's own "thorough observation" of the interrogation video: "the officers were polite and considerate of [Samuel] … the officers respected [Samuel's] personal

space, and … overall the interrogation tactics employed did not overbear [Samuel's] will."  (3-ER-184.)  Because of the stark differences in their interrogations, <u>Doody</u> is not helpful to Samuel, even as mere persuasive authority.

Ultimately, with respect to both of his claims, Samuel is asking this Court to re-weigh and second guess the factual findings and legal conclusions of the state courts.  In so doing, Samuel cannot overcome the stringent AEDPA standards.

For these reasons, and given the deference afforded to the state courts' adjudication of his coerced statements claim, Samuel has failed to demonstrate that the magistrate court erred in concluding that the Idaho Supreme Court's rejection of this claim was either contrary to, or based upon an unreasonable application of, clearly established federal law; or that any of the state courts' material factual conclusions, such as that the *Miranda* warnings were proper and that Samuel's *Miranda* waiver was valid, were unreasonable.  For all of the same reasons as discussed above, the state also submits that this claim fails even under *de novo* review.

## CONCLUSION

Samuel has failed to establish any basis for this Court to reverse the magistrate court, and respectfully requests that this Court affirm the magistrate court's judgment denying and dismissing his habeas petition.

Dated this 30th day of August, 2024.

s/ *Mark W. Olson*
MARK W. OLSON
Deputy Attorney General
Capital Litigation Unit

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** __23-35408_____

    I am the attorney or self-represented party.

    **This brief contains** ___13,154_____ **words,** including _____0_____

words manually counted in any visual images, and excluding the items exempted by

FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

    I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _s/Mark W. Olson_____ **Date** __August 30, 2024__

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**9th Cir. Case Number(s)** 23-35408

The undersigned attorney or self-represented party states the following:

[ ]  I am unaware of any related cases currently pending in this court.

[x]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/ Mark W. Olson                              **Date** 8/30/2024

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on or about the 30th day of August, 2024, I served a true and correct copy of the foregoing document by the method indicated below, and addressed to the following:

Craig Durham                              _____ U.S. Mail
Ferguson Durham, PLLC                     _____ Hand Delivery
223 N. 6th Street, Suite 325              _____ Overnight Mail
Boise, ID 83702                                 Facsimile
Email: chd@fergusondurham.com

                                          _____
                                            X   Electronic Court
                                          _____ Filing


                                          /s/ *Mark W. Olson*
                                          MARK W. OLSON
                                          Deputy Attorney General
                                          Capital Litigation Unit